## STATE OF CONNECTICUT *v.* JOHNNIE ARTHUR
### (AC 32586)

Gruendel, Robinson and Alvord, Js.

Argued March 15—officially released May 3, 2011

*Auden Grogins*, special public defender, for the appellant (defendant).

*Rocco A. Chiarenza*, deputy assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor*, state's attorney, and *Melanie Cradle*, assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Johnnie Arthur, appeals from the judgment of conviction, rendered after a jury trial, of criminal attempt to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-49 (a) (2), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1)

and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that (1) the trial court abused its discretion in denying his motion to suppress evidence of his pretrial identification, (2) the court abused its discretion in admitting into evidence a tape-recorded statement pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and (3) the evidence adduced at trial was insufficient to sustain the jury's finding that he perpetrated the crimes. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On the evening of September 29, 2007, the victim, Andrew Garnett, attended a party at the Sports Haven nightclub in New Haven with friends, including Dionte Dixon.[1] While there, they met Nancy Sonemaneevong, Barbara "Shanita" Green and the defendant's girlfriend, Robin DiBenedetto. Green informed Dixon that she had a crush on his friend, Eugene Wright, and Dixon arranged for her to meet Wright later that evening. When the party ended, those individuals departed for Wright's apartment at 30 Glade Street in West Haven. Dixon drove his own car, the victim rode in a second vehicle with other friends, and DiBenedetto drove Sonemaneevong and Green in her red Pontiac Grand Am. At that time, DiBenedetto was speaking with the defendant on her cellular telephone.

When the vehicles arrived at the parking lot at 30 Glade Street in the early morning hours of September 30, 2007, Green immediately entered Wright's apartment. At that time, the victim and Dixon entered the Pontiac Grand Am and began flirting with DiBenedetto

---

[1] The party at the Sports Haven nightclub was an album release party featuring a rap music concert.

and Sonemaneevong. When Sonemaneevong needed to use a bathroom, Dixon escorted her into Wright's apartment. The victim remained in the vehicle with DiBenedetto, who still was on the telephone with the defendant.

A bystander in the parking lot, Jamie Henderson, observed a man he knew as "Drew" speaking to the female driver of the red Pontiac vehicle. He then witnessed a gray Ford Taurus enter the parking lot, from which a male wearing a dark colored hoodie and hat emerged looking "like he meant business." With a hand in the hoodie, the man asked DiBenedetto to leave with him, and she refused. The victim informed the man that " '[s]he good. She with us.' " The man then fired multiple gunshots at him from close range. As the victim crawled on the ground, the Ford Taurus and the Pontiac Grand Am fled the scene.

Officer Radames Gonce of the West Haven police department, who at the time was responding to an unrelated call nearby, heard the gunshots emanate from the Glade Street area. As Gonce drove toward Glade Street, he saw several vehicles driving away at a high rate of speed, including a gray Ford Taurus with a New York license plate. When he arrived at the parking lot outside Wright's apartment, Gonce found the victim lying on the ground. The victim subsequently was transported by ambulance to Yale-New Haven Hospital, where he was treated for life threatening injuries that included, inter alia, a collapsed lung, three gunshot wounds to the chest and one gunshot wound to his left thigh. Following emergency surgery, the victim recuperated in the hospital for seven days.

While investigating the scene of the shooting, Detective Anthony Simone of the West Haven police department learned that the red Pontiac Grand Am had been located and asked the operator to return to the Glade

Street parking lot. When the vehicle arrived, the operator was identified as DiBenedetto, who then was transported to police headquarters. Simone subsequently interviewed Henderson, Sonemaneevong and Green, from which he learned that DiBenedetto's boyfriend may have been involved in the shooting. He then interviewed DiBenedetto, who was uncooperative and identified her boyfriend only as "Johnnie." Further investigation revealed that DiBenedetto had been talking on her cellular telephone with the defendant up to the time of the incident and that she had two cellular telephones registered in her name, both of which were used during that conversation. Telephone records, which were admitted into evidence at trial, established that DiBenedetto's initial conversation in the early morning hours of September 30, 2007, lasted forty-one minutes and three seconds, from 3:10 a.m. to 3:51 a.m. Telephone records also established that although the signal from DiBenedetto's other telephone was routed through a cell tower in New Haven at 3:10 a.m., it was routed through a tower on Campbell Avenue in West Haven from 3:51 a.m. to 3:56 a.m. The Campbell Avenue tower is in the vicinity of Glade Street and was used by both of DiBenedetto's cellular telephones at that time. Additional calls between DiBenedetto's two telephones were made at 3:52 a.m., 3:55 a.m. and 3:57 a.m. The police received a 911 call reporting the shooting at 3:57 a.m.

Simone's investigation also revealed that DiBenedetto lived at 719 Orchard Street in New Haven with the defendant. When police arrived at that property on the day of the shooting, they found a silver Ford Taurus with a New York license plate in the backyard. Gonce arrived later and confirmed that the vehicle looked like the one he observed fleeing the Glade Street area moments after the shooting. The police seized the vehicle, and a search revealed a cellular telephone and a

photograph of the defendant with friends at what appeared to be the party at the Sports Haven nightclub hours earlier. The police also learned that DiBenedetto had rented the vehicle from Enterprise Rental Car from September 28, 2007, through October 1, 2007.

When Simone interviewed the defendant, he confirmed that he had attended the party at the Sports Haven nightclub a day earlier. The defendant stated that he attended with friends and that he did not drive there "because he doesn't drive." The defendant did not provide any further information to police at that time. Nonetheless, Brenda Ollison, DiBenedetto's upstairs neighbor at 719 Orchard Street, testified at trial that she observed the defendant driving the Ford Taurus on the weekend in question.

As a result of their preliminary investigation, the police obtained a description of the person who had shot the victim. Simone detailed that description at trial as follows: "Black male, approximately five foot nine, at the time wearing dark pants with a design on the rear pockets, a dark hooded sweatshirt with red drawstrings and a red and white design on the front, and a black fitted baseball style cap." DiBenedetto's sister, Lori Ann Johnson, testified that she had cared for DiBenedetto's son on the evening of September 29, 2007, so that DiBenedetto could attend the party at the Sports Haven nightclub. When Johnson went to DiBenedetto's residence at 719 Orchard Street on October 1, 2007, DiBenedetto and the defendant were there. Johnson observed the defendant's recently washed clothes on a chair. She saw a black "zip-up," a black tee shirt and dark jeans, which she stated the defendant had worn to the Sports Haven nightclub. When shown the outfit worn by the defendant in the photograph found in the search of the Ford Taurus, Johnson identified it as the same outfit she had seen drying on the chair at 719

Orchard Street. Johnson further testified that DiBenedetto drove a "red Pontiac Grand Am GT" at the time of the shooting.

While recovering from surgery at the hospital, the victim spoke with Detective Usha Carr of the West Haven police department. Carr testified that the victim stated that, on the night of the shooting, he was "hanging out" in the parking lot at 30 Glade Street with friends. While the victim was chatting with a white female in a red Pontiac Grand Am, "a black male drove up" in a silver Ford Taurus. The man repeatedly told the woman with whom the victim had been speaking to leave with him. The victim told the man that " '[s]he good. She with us.' " The victim's next recollection was the smell of gunpowder. During the interview, Carr showed the victim a photographic array, informing him that the shooter "might or might not be" in the array. The victim selected the defendant's photograph as that of his assailant. The victim refused to sign the photographic array or to provide a recorded statement, however, because he did not want to be labeled a "snitch." At trial, the victim identified the defendant in court as the individual that he had selected from the photographic array.

The defendant thereafter was arrested and charged with criminal attempt to commit murder, assault in the first degree, criminal possession of a firearm and carrying a pistol or revolver without a permit. While incarcerated at the MacDougall-Walker Correctional Institution, the defendant received a visit from DiBenedetto and his mother, Judith Wright, on January 23, 2009. The visit transpired in a noncontact area, which contains "a glass that separates [the inmate from the visitors] with a booth and the visitors are on the opposite side of them and they make contact through two . . . phone headsets." On the date in question, Correction Officer Rudolfo Santana observed the defendant "looking over his shoulder, towards where I was standing,

kind of suspiciously, sort of nervous. So I started observing him a little bit more closely. I noticed that he was moving his right hand, like trying to hide something, bringing it up, bringing it down, and every time I looked towards him, he would bring it down. So I approached him from the backside and I noticed he had his right hand against the window with a piece of paper and I asked him for it. He handed it to me with no problem. I looked at the piece of paper. I saw it had some information on it, so I stated to him to continue with his visit, and I walked out of that particular area there. He [stood] up, follow[ed] me, and asked me what I was going to do with the paper and [told me] to throw it away, and I gave him a direct order to go sit back down and continue with his visit." Santana identified the defendant in court as that inmate. Santana further testified that he brought the paper to a supervisor immediately.

The paper was admitted as a full exhibit at trial, and the clerk of court read its contents. The paper first listed two telephone numbers, both of which bore the 203 area code, and then stated: "(NAME) Drew Tell him please don't cooperate with the courts, [a]nd to tell his friends not too. And if [I] would of known what [I] know now it wouldn't never happened, [d]on't never tell him your real name ok ma. Ask him if he could just help me, by not cooperating, cry too ma, don't talk to nobody but him ma, ok just him. I need that nigga to not cooperate with them anymore. [I]f that's done, with the victim theirs no case." At trial, the victim testified that, after the shooting, he learned that the defendant was his cousin.

At the conclusion of the state's case in his criminal trial, the defendant moved for a judgment of acquittal on all charges, arguing primarily that the state had not proven beyond a reasonable doubt that the defendant had shot the victim. The court denied that motion, and the jury thereafter found the defendant guilty on all

counts.[2] The court rendered judgment accordingly and sentenced the defendant to a total effective term of twenty-five years incarceration. This appeal followed.

I

The defendant claims that the court abused its discretion in denying his motion to suppress evidence of his pretrial identification by the victim.[3] "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability *both* were incorrect." (Emphasis added; internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 547–48, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

As our Supreme Court has explained, "[o]nly if the procedures used to identify the accused are unnecessarily suggestive are we required to analyze the factors that determine the reliability of an identification for due process purposes." *State* v. *Miller*, 202 Conn. 463,

---

[2] At trial, the defendant stipulated on the record both that he "was a person prohibited from possessing a firearm pursuant to the . . . general statutes" and that he "did not hold a Connecticut state [revolver] or pistol permit."

[3] The defendant objected at trial to the admission of the victim's pretrial identification, thereby preserving his claim for appeal.

470, 522 A.2d 249 (1987). In his principal appellate brief, the defendant concedes that essential prerequisite is lacking, stating that "[i]n the instant case, the defendant does not claim that the photo array used to obtain [the victim's] pretrial [identification] of the defendant was overly suggestive." The court agreed with that assessment, expressly crediting the testimony of Carr and finding that "[t]here is no evidence of any coercion on the part of the detective." The court further credited the fact that Carr informed the victim that his assailant "may or may not be" in the photographic array in denying the motion to suppress. On our careful review of the record, we agree with the court's determination that the victim's pretrial identification of the defendant was not overly suggestive. It thus did not abuse its discretion in denying the defendant's motion to suppress.

## II

The defendant next claims that the court abused its discretion in admitting into evidence a tape-recorded statement pursuant to *State* v. *Whelan*, supra, 200 Conn. 743. We disagree.

The following additional facts are relevant to this claim. Ollison lived on the floor above DiBenedetto's residence at 719 Orchard Street. On October 4, 2007, she made the following tape-recorded statement to police:

"[Detective Simone]: Brenda, for the record for me, could you state your name and spell your last name?

"[Ollison]: Brenda Ollison . . . .

"[Detective Simone]: Okay, Brenda. Brenda, we've been here throughout the past few days on and off. You're aware that we were investigating a shooting . . . that took place in West Haven on Glade Street?

"[Ollison]: Yes.

"[Detective Simone]: And you're aware that on Sunday we were here, and we towed from the back lot here a Ford Taurus with New York plates?

"[Ollison]: Yes.

"[Detective Simone]: You, you're familiar with that car?

"[Ollison]: Yes, I am.

"[Detective Simone]: Okay. Could you tell us how that car came to be here?

"[Ollison]: Um, actually I seen the car Friday, Saturday and Sunday.

"[Detective Simone]: Okay.

"[Ollison]: And, um, parked in the back. I seen Johnnie driving it.

"[Detective Simone]: Johnnie, we're talking about [DiBenedetto's] boyfriend?

"[Ollison]: [DiBenedetto's] boyfriend.

"[Detective Simone]: Johnnie Arthur?

"[Ollison]: Johnnie Arthur.

"[Detective Simone]: Okay.

"[Ollison]: I . . . didn't know his last name.

"[Detective Simone]: Okay.

"[Ollison]: But I seen him in the car one time, and that was basically it.

"[Detective Simone]: And did you see Johnnie driving that car . . . at least on one occasion?

"[Ollison]: Yes.

"[Detective Simone]: Okay.

"[Detective Sergeant Walter Casey]: Just one thing, that car, what color was the car?

"[Ollison]: Um, gray, like gray/silver.

"[Detective Sergeant Casey]: Okay.

"[Ollison]: A Ford Taurus with New York plates."

At trial, Ollison initially testified during direct examination that she had seen the defendant, whom she identified in court, drive that vehicle one time on the weekend in question. On cross-examination, Ollison's testimony changed. Before testifying that she suffers from short-term memory loss, the following colloquy occurred:

"[The Defendant's Counsel]: Did [the police] ask you if you had seen [the defendant] in the car?

"[Ollison]: They asked me if I had seen him in the car, but I said I seen him one time in the car, and it was early, it was like early during the day.

"[The Defendant's Counsel]: Right.

"[Ollison]: And the car had been parked back there, because I have a dog. I had to let my dog out.

"[The Defendant's Counsel]: Right. When you say you saw him in the car, you didn't see him driving the car?

"[Ollison]: No.

"[The Defendant's Counsel]: No. You just saw him?

"[Ollison]: Just parked, and he was in the car."

On redirect examination, the state questioned Ollison about that testimony. When the prosecutor inquired as to whether she recalled telling the police that she had seen the defendant driving the vehicle, Ollision testified: "No. I never seen him drove the car, I just seen him in the car." At that time, the state sought to have Ollison's

tape-recorded statement admitted into evidence as a prior inconsistent statement, to which the defendant objected. After hearing from the prosecutor and defense counsel outside the presence of the jury, the court ultimately admitted the statement pursuant to *Whelan.* The defendant now challenges the propriety of that evidentiary ruling.

In *State* v. *Whelan,* supra, 200 Conn. 753, our Supreme Court determined that an out-of-court statement is admissible as substantive evidence if (1) the statement is a prior inconsistent statement, (2) it is signed by the declarant, (3) the declarant has personal knowledge of the facts stated therein, and (4) the declarant testifies at trial and is subject to cross-examination. A prior tape-recorded statement that satisfies these conditions also is admissible as substantive evidence. Id., 754 n.9. "The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan,* is a matter within the . . . discretion of the trial court. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Pierre,* 277 Conn. 42, 56, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). In addition, we note that "once the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan,* that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible." *State* v. *Mukhtaar,* 253 Conn. 280, 306, 750 A.2d 1059 (2000).

The defendant's claim hinges on his contention that Ollison's tape-recorded statement was not inconsistent

with her trial testimony.[4] He argues that because Ollison initially testified that she had seen him driving the Ford Taurus, her tape-recorded statement could not be deemed inconsistent with her testimony at trial. The defendant is mistaken.

"Whether there are inconsistencies between the two statements is properly a matter for the trial court. . . . Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . and the same principle governs the case of the forgetful witness. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. *Thus, inconsistencies may be found in changes in position* . . . . The trial court has considerable discretion to determine whether evasive answers are inconsistent with prior statements." (Emphasis in original; internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 649, 945 A.2d 449 (2008).

The record plainly discloses a change in position on the part of Ollison. Whereas on direct examination she stated that she had witnessed the defendant driving the Ford Taurus "one time" on the weekend in question, she testified on cross-examination and redirect examination that she never saw him driving the vehicle but,

---

[4] Although the defendant also relies on § 6-10 of the Connecticut Code of Evidence, that section pertains to the admission of a prior inconsistent statement for impeachment, not substantive, purposes and hence is inapplicable to the present case. As the commentary to that rule states, "[t]he substantive admissibility of prior inconsistent statements is treated elsewhere in the Code." Conn. Code Evid. § 6-10 (a), commentary.

rather, only saw him sitting in it while parked. The inconsistency in that testimony requires no elaboration. In light of that inconsistency, the court properly determined that the tape-recorded statement satisfied the requirements of *Whelan* and, hence, was presumptively admissible. See *State* v. *Mukhtaar*, supra, 253 Conn. 306. We therefore conclude that the court did not abuse its discretion in admitting Ollison's tape-recorded statement into evidence.

## III

The defendant also raises a claim of evidential insufficiency. Specifically, he maintains that the evidence concerning the identity of the perpetrator was insufficient to establish his participation in the charged crimes. We do not agree.

"[T]he [d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . The standard of review for a sufficiency of the evidence claim employs a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support [its] verdict. . . .

"It is axiomatic that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the

jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury] would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Reid*, 123 Conn. App. 383, 391–92, 1 A.3d 1204, cert. denied, 298 Conn. 929, 5 A.3d 490 (2010).

In the present case, there is a reasonable view of the evidence that supports the jury's finding that the defendant perpetrated the charged crimes. The jury was presented with evidence that, only days after the shooting, the victim selected the defendant's photograph as that of his assailant from the photographic array, a selection he confirmed in court during the trial.

In addition, the state presented an abundance of circumstantial evidence indicating that the defendant was the person who had shot the victim in the parking lot at 30 Glade Street. Sonemaneevong testified that DiBenedetto was talking to the defendant on her cellular telephone as they traveled from the Sports Haven nightclub to the parking lot. The cellular telephone records introduced into evidence established that both telephones used in that conversation were registered in DiBenedetto's name and further demonstrated that the signal of the telephone used by the defendant during that forty-one minute conversation initially was routed through a cell tower in New Haven but thereafter was routed through the Campbell Avenue tower in the vicinity of Glade Street from 3:51 a.m. to 3:56 a.m. Those records further indicate that additional calls between those two telephones were placed at 3:52 a.m., 3:55 a.m. and 3:57 a.m. The jury heard evidence that police received a 911 call reporting the shooting at 3:57 a.m.

The jury also heard the testimony of Henderson, who witnessed the shooting. At that time, Henderson was in the parking lot waiting for a friend to arrive. He observed a red vehicle driven by a white female parked in the lot, who was talking for approximately twenty minutes to a black male he knew as "Drew." Henderson then observed a gray Ford Taurus enter the parking lot, from which a male wearing a dark colored hoodie and hat emerged looking "like he meant business." With a hand in his hoodie, the man approached the red vehicle and began speaking with the female driver, whom it appeared the man knew. A moment later, Henderson watched as the man fired several shots at "Drew" from an "arm['s] reach" distance. Henderson then observed "Drew" crawling on the ground as both the red vehicle driven by the white female and the Ford Taurus driven by the assailant fled.

The jury learned that, in the moments after shots had been fired, Gonce witnessed a gray Ford Taurus with a New York license plate driving away from Glade Street at a high rate of speed. The jury also learned that on the day of the shooting, the police discovered a silver Ford Taurus with a New York license plate in the backyard of DiBenedetto's residence at 719 Orchard Street, which Gonce later confirmed looked like the vehicle he had observed fleeing the Glade Street area immediately after the shooting. DiBenedetto had rented the vehicle from Enterprise Rental Car from September 28, 2007 through October 1, 2007. Contrary to the defendant's statement to the police that "he doesn't drive," the jury was presented with evidence that DiBenedetto's upstairs neighbor witnessed the defendant driving that vehicle on the weekend in question. In addition, the police found in the vehicle a photograph of the defendant, which was introduced into evidence, wearing an outfit that DiBenedetto's sister testified that the defendant had worn to the Sports Haven nightclub on the night of the shooting. Johnson also testified that she observed that recently washed outfit drying on a chair in DiBenedetto's residence two days after the shooting. That outfit matched the description of the shooter's attire described by Henderson in his testimony.

Finally, the note that Santana confiscated from the defendant during his visit with DiBenedetto and his mother at the MacDougall-Walker Correctional Institution was admitted into evidence. In that note, the defendant asked his mother to contact "Drew" in an effort to convince him and his friends not to cooperate with the criminal investigation. The defendant further stated that if the victim refused to cooperate, there would be no case against him. From that piece of evidence, the jury could connect Henderson's identification of the victim as "Drew" to the defendant's similar identification of the victim in the note. Equally significant, the

jury could derive evidence of consciousness of guilt from that note. See, e.g., *State* v. *Gray*, 221 Conn. 713, 725–26, 607 A.2d 391 (guilty consciousness is perhaps strongest evidence that person is guilty doer), cert. denied, 506 U.S. 872, 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992); *State* v. *Leecan*, 198 Conn. 517, 534, 504 A.2d 480 (noting that our Supreme Court repeatedly "has approved the admission of threats against or attempted intimidation of witnesses as evidence of consciousness of guilt"), cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986).

Construing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have concluded beyond a reasonable doubt that the defendant was the person who shot the victim in the parking lot at 30 Glade Street on September 30, 2007. Accordingly, his claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.