# STATE OF CONNECTICUT *v.* CARLOS MICHAEL RODRIGUEZ
## (AC 32512)

Gruendel, Lavine and Flynn, Js.

Argued September 10—officially released December 18, 2012

*William B. Westcott,* for the appellant (defendant).

*Laurie N. Feldman,* special deputy assistant state's attorney, with whom, on the brief, were *David I. Cohen,* state's attorney, and *Maureen Ornousky,* senior assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Carlos Michael Rodriguez, appeals from the judgment of conviction, rendered after a jury trial, of two counts of attempt to commit assault in the second degree in violation of General Statutes §§ 53a-49 (a) (1) and 53a-60 (a) (1), one count of interfering with a police officer in violation

of General Statutes § 53a-167a and one count of carrying a dangerous weapon in violation of General Statutes § 53-206. The defendant claims that (1) the court erred in admitting into evidence a prior statement to police of a state's witness, (2) the court lacked jurisdiction to modify his sentence and (3) there was insufficient evidence to sustain his conviction of two counts of attempt to commit assault, as charged by the state. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the afternoon of January 15, 2008, after returning from his day in high school, the defendant, along with Charles Lauture and Kendell Woodley, went to the home of Kevin Whittingham, where Whittingham resided with his mother, Christina Esposito. Shortly after his arrival, the defendant asked Esposito to repay him $20 that she allegedly owed him for drugs he had provided to her on an earlier occasion. Esposito disputed owing the defendant money and refused to pay him, claiming that the drugs he had given her were counterfeit. The two argued over the debt, both yelling and cursing. Whittingham attempted to defuse the argument by telling both the defendant and Esposito to calm down. When Esposito continued her refusal to pay, the defendant drew a knife with a five inch blade from the waist of his pants and demanded the money again. Esposito then fled her apartment via an outside porch that connects to an adjoining apartment. Whittingham told the defendant to put down the knife, but the defendant did not. Instead, the defendant ran from the apartment, chasing Esposito. As he passed Lauture, who was on the porch, Lauture attempted to stop the defendant from continuing his pursuit of Esposito. Lauture moved to restrain the defendant and after a struggle, the defendant slashed Lauture's torso with the knife. The knife cut through Lauture's two layers of clothing, causing

an abrasion on his chest. The defendant then resumed chasing Esposito.

While the defendant and Lauture scuffled, Esposito sought refuge in the bedroom of a neighboring apartment occupied by Steven Arzu and his family. She ran through Arzu's apartment, knocking over furniture to create obstacles between her and the defendant. Esposito used Arzu's phone to call 911 for assistance, reporting that a young man was trying to attack her with a knife.[1] The defendant followed Esposito to Arzu's bedroom, pounding and kicking the door, yelling, "I want my money." As Esposito held the door closed, the defendant began to stab the door with the knife. Esposito had to continually move her hand to avoid being stabbed by the knife as it pierced the door. The defendant then broke the door in half and entered the bedroom. Esposito backed away from the defendant, toward the bedroom wall, throwing a television on to the floor to block the defendant's path. As she retreated from the defendant, Esposito fell to the ground and shielded herself from him with a piece of the broken bedroom door.

Meanwhile, several Stamford police officers responded to Esposito's and Arzu's 911 calls. Officers Tom Comerford, Steven Perrotta and David Sileo arrived on the scene seconds after Lieutenant Nick Montagnese and Officer Wayne James. Hearing Esposito's screams, Montagnese immediately ran into the building and up the stairs to Arzu's apartment, with James following close behind him. As Montagnese entered the apartment, he saw the defendant, holding a knife and screaming, standing at the threshold of the bedroom to which Esposito had fled. Montagnese repeatedly ordered the defendant to drop the knife, but the defendant did not respond. Instead, the defendant continued

---

[1] Minutes later Arzu also called 911 from a nearby store.

to focus his attention on Esposito. Montagnese then shoved the defendant in order to get his attention. In response, the defendant turned away from Esposito and began to approach Montagnese with the knife raised above his head. Montagnese backed away from the defendant in order to keep a safe distance between him and the knife, while instructing the defendant to drop the weapon. As he was walking backward away from the defendant, Montagnese tripped and fell, landing on his back. When James, who was standing in a nearby doorway, observed Montagnese begin to fall, making him vulnerable to being stabbed by the defendant, he shot the defendant twice. Montagnese then radioed for paramedic assistance for the defendant. The defendant was taken to the hospital where he received treatment for his gunshot wounds.

On December 1, 2009, the defendant was charged with two counts of attempt to commit assault in the first degree, one count of assault in the second degree, one count of assault on a police officer and one count of carrying a dangerous weapon.[2] After a jury trial, the defendant was convicted of two counts of attempt to commit assault in the second degree,[3] interfering with a police officer and carrying a dangerous weapon. He was acquitted of the charge of assault in the second

[2] The defendant, sixteen years old at the time of the incident, was originally charged as a youthful offender by way of two counts of criminal attempt to commit murder in the commission of a felony, one count of assault in the first degree, one count of burglary in the first degree, one count of carrying or selling a dangerous weapon, one count of reckless endangerment in the first degree, one count of risk of injury to a child, one count of interfering with an officer or resisting arrest, one count of criminal mischief in the first degree and one count of threatening in the second degree. Upon the state's motion, the defendant's case was transferred from the youthful offender docket to the criminal docket of the Superior Court.

[3] On December 17, 2009, shortly before jury deliberations began, the state filed an information with the lesser included offenses of two counts of attempt to commit assault in the second degree, two counts of attempt to commit assault in the third degree and one count of interfering with a police officer.

degree. The court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of fourteen years, execution suspended after nine years, followed by three years of probation.[4] This appeal followed.

I

We address first the defendant's claim that the court improperly admitted Whittingham's statement to police as part of the state's case-in-chief. The defendant asserts that this ruling by the court was both a misapplication of evidentiary law and a violation of his sixth amendment right to confrontation under the federal constitution.[5] We disagree on both accounts.

The following additional facts are relevant to this claim. Less than two hours after the incident, Whittingham went to the Stamford police department and gave a signed and sworn statement to Officer Angel Gonzalez. The statement included Whittingham's basic biographical information and recounted the events of the afternoon, including the defendant's demand for money from Esposito, his drawing a knife from his pants and threatening Esposito with it, his altercation with Lauture on the porch and his interaction with Montagnese leading up to James shooting him. Gonzalez typed the statement, after which Whittingham initialed each paragraph to indicate its accuracy.

During the time between the defendant's arrest and when his case went to trial, Whittingham was convicted of a felony. At the time of trial, when the state wished

---

[4] As will be discussed in part II of this opinion, the sentencing allocation that resulted in this total effective sentence was later modified by the court, an action the defendant challenges with this appeal.

[5] "The sixth amendment to the United States constitution provides in relevant part: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' The confrontation clause of the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment." *State* v. *Sandoval*, 263 Conn. 524, 532 n.17, 821 A.2d 247 (2003).

to call him as a witness, Whittingham was incarcerated and did not wish to testify.[6] The state alerted the court and defense counsel, the day before calling Whittingham, that Whittingham would decline to testify.[7] When the state ultimately called Whittingham during its case-in-chief, Whittingham took an oath to testify truthfully and went on to state that he did not remember the events from the afternoon of January 15, 2008, nor did he remember making a signed sworn statement to police. Moreover, Whittingham stated repeatedly, to both the state and defense counsel, that since he could not remember any of the events in question from January 15, 2008, then he believed that they did not, in fact, occur. He testified that this lack of memory rendered his statement to police untrue.[8] After the state unsuccessfully attempted to refresh Whittingham's memory by allowing him to read his statement to police, the court also questioned Whittingham to determine whether he was simply stating that he was unable to remember the events contained in his statement to police or if he was affirmatively stating that they did not happen.[9] Defense counsel conducted a cross-examination and four subsequent recross-examinations of Whittingham. In addition to restating that he had no

[6] Whittingham was incarcerated in the same facility as the defendant.

[7] As the court stated, the state expected "a *Whelan* issue" with calling Whittingham. See *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[8] The following is an excerpt of the state's redirect examination of Whittingham:

"Q. But it's not true, what's in the statement?

"A. Yes.

"Q. And you are saying today that what's in the statement is not true?

"A. Yes.

"Q. How do you know it's not true if you don't remember anything from that day?

"A. Because I can't confirm that it's true if I don't remember it."

[9] "The Court: Now on those things, sir, are you saying that those events that you read about what happened at the apartment, that those events did not happen?

"[Whittingham]: That is what I'm saying.

memory of the relevant incident, in response to defense counsel's questioning, Whittingham testified that he knew the defendant from school, that the defendant had not threatened him, and that he believed that when he spoke to police immediately following the incident that they had him sign a statement prepared without his involvement. Whittingham also testified specifically that he never saw any conflict occur between the defendant and police, between the defendant and Esposito or between the defendant and Lauture.

The state then called Gonzalez to testify, outside the presence of the jury, about the circumstances surrounding the taking of Whittingham's statement. Gonzalez testified that he typed the statement as Whittingham relayed his recollection of the afternoon. Gonzalez stated that after he typed the statement, he had Whittingham read the statement aloud and asked him to correct any mistakes. As Whittingham read each paragraph, Gonzalez asked him to indicate that it contained no errors by initialing it. Whittingham initialed each paragraph and made no corrections to the statement. Gonzalez also testified regarding the form which accompanies the body of written statements given by both witnesses and suspects. Specifically, he pointed to the oath printed on the form that affirms the truthfulness of the statement annexed to it. Whittingham signed the form containing the oath and Sergeant James Van Allen, a notary public, notarized it.

* * *

"The Court: I guess what I'm trying to find out, sir, is if there are parts of your statement that refer to [the defendant]. Would you be able to tell counsel these are not correct or they are inaccurate in part?

"[Whittingham]: No, they are not correct.

"The Court: I'm sorry?

"[Whittingham]: Not correct.

"The Court: You would say they are not correct. And why would you be able to say they are not correct?

"[Whittingham]: Because I read the statement. It didn't happen, so it's incorrect."

After Gonzalez testified, the state moved to have Whittingham's statement admitted into evidence as a prior inconsistent statement. The defendant objected to its admission on the grounds that Whittingham, due to his stated lack of memory, did not demonstrate that he had personal knowledge of the contents of the prior statement, nor could the defendant cross-examine him.[10] The court took a recess to research the issue and consider both parties' arguments. After reconvening, the court orally issued its decision. It found that Whittingham's statement had "all the indicia of reliability" required by "the evidence code in Connecticut, and under the case law." The court determined that Whittingham's "testimony was, in effect, a denial of the statements . . . as to the substance of [the defendant's] actions on the date in question. And that, in effect, is not lack of recollection. It is a denial of the accuracy of the statement." Accordingly, the court admitted, as substantive evidence, Whittingham's statement to police.[11]

The defendant claims that the court erroneously admitted Whittingham's prior statement to police in contradiction of the evidentiary standards established in *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), later codified in § 8-5 (1) of the Connecticut Code of Evidence. We do not agree.

"Before turning to the merits of the defendant's . . . claim, we set forth the standard of review. The admissi-

---

[10] The defendant argued that this functional inability to cross-examine Whittingham made the statement inadmissible under evidentiary principles, as well as under the confrontation clause of the sixth amendment to the federal constitution.

[11] The parties, by agreement, redacted portions of Whittingham's statement related to gang activity and guns, as they determined the prejudicial effect of these topics would outweigh their probative value.

bility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the . . . discretion of the trial court. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 56, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). "In addition, we note that once the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan*, that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible." (Internal quotation marks omitted.) *State* v. *Arthur*, 128 Conn. App. 371, 383, 18 A.3d 610, cert. denied, 302 Conn. 910, 23 A.3d 1249 (2011).

"In *State* v. *Whelan*, supra, [200 Conn. 751–53] we reviewed our continued adherence to the traditional rule prohibiting the use as substantive evidence of a prior inconsistent out-of-court statement of a nonparty witness. . . . We concluded that an exception to the hearsay rule is necessary to allow the trial court to admit for substantive purposes prior inconsistent statements given under prescribed circumstances reasonably assuring reliability. . . . We therefore adopted a rule allowing the substantive use of prior written inconsistent statements where the declarant: (1) has signed the statement; (2) has personal knowledge of the facts stated; and (3) testifies at trial and is subject to cross-examination. . . . This rule has also been codified in § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 57–58.

The defendant asserts that Whittingham's statement was admitted improperly because it was not inconsistent, therefore precluding the issue of its admissibility from a *Whelan* analysis. Specifically, he argues that in order for the court to conclude that a witness' prior statement is inconsistent where the witness testifies to a complete loss of memory regarding the contents of that statement, it must first find that the witness' memory loss is feigned. We do not agree. In determining that Whittingham's testimony was inconsistent with his prior statement to police, we find that the court did not abuse its broad discretion. Moreover, we do not conclude that when a witness testifies to a loss of memory the court is required to make a finding that the memory loss is feigned in order for it to decide that a prior statement is inconsistent with present testimony.

"Whether there are inconsistencies between two statements is properly a matter for the trial court. . . . Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . and the same principle governs the case of the forgetful witness. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection. . . . The trial court has considerable discretion to determine whether evasive answers are inconsistent with prior statements." (Citations omitted; internal quotation marks omitted.) *State v. Whelan,* supra, 200 Conn. 748–49 n.4.

Whittingham's own testimony indicates that the court did not abuse its discretion in concluding that his prior statement to police was inconsistent. Whittingham

unequivocally repudiated his prior statement by saying, "It didn't happen." Whittingham's testimony was not simply that he did not recall the incident that occurred on January 15, 2008; rather, he asserted that his lack of memory meant that the events described in his statement were simply untrue. He clearly and repeatedly stated that the contents of his prior statement were patently incorrect. See footnote 8 of this opinion. Given Whittingham's explicit and unwavering renunciation of his prior statement, the court did not abuse its discretion in finding inconsistency between Whittingham's testimony at trial and his prior statement to police.[12]

Furthermore, the court was not required to find that Whittingham was feigning his memory loss in order to conclude that his prior statement was inconsistent. *Whelan* and its progeny require no such finding. Rather, *Whelan* plainly states that a claim of memory loss alone can serve as the basis for a finding of inconsistency. *State* v. *Whelan*, supra, 200 Conn. 748–49 n.4. In considering the total effect of Whittingham's testimony, including both his assertions of complete memory loss and his refutation of his statement to police, the court properly, and within its discretion, evaluated the issue of inconsistency.

The defendant next argues that despite the court's finding that Whittingham's prior statement met the criteria set forth in *Whelan*, the statement was nonetheless unreliable and should not have been admitted. We are not persuaded.

"[T]he linchpin of admissibility is reliability: the statement may be excluded as substantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding

---

[12] We note that Whittingham need not have affirmatively renounced his statement for the court to have properly decided it was inconsistent. The court makes its determination based on the overall effect of the witness'

process. In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria, the statement is admissible as substantive evidence . . . . [I]t will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury." *State* v. *Mukhtaar*, 253 Conn. 280, 306–307, 750 A.2d 1059 (2000).

The defendant, who bore the burden of showing that the statement was unreliable, pointed to Whittingham's lack of memory at the time of trial as the sole indicator of the unreliability of his statement to police.[13] However, this misapprehends the issue. The question before the court, under a *Whelan* analysis, is whether the circumstances surrounding the prior statement contain adequate indicia of reliability. Gonzalez testified regarding the circumstances under which Whittingham gave his sworn statement, and the defendant elicited no testimony or other evidence from him that would suggest that the statement was "untrustworthy" or would "subvert the fairness of the fact-finding process." Id., 306. Instead the defendant merely asserted that Whittingham lacked credibility, rendering his statement unreliable. Yet, rather than providing a basis for the court to keep Whittingham's statement from the jury, Whittingham's credibility, or lack thereof, is precisely an issue for the trier of fact and the statement was properly admitted. See *State* v. *Osborn*, 41 Conn. App. 287, 291, 676 A.2d 399 (1996) ("[i]t is the trier's exclusive province to weigh the conflicting evidence and determine the credibility of witnesses"). We therefore conclude that the court

testimony, looking at both omissions and contradictions. See *State* v. *Whelan*, supra, 200 Conn. 748–49 n.4.

[13] Before the court ruled on the admissibility of Whittingham's prior statement, defense counsel argued to the court: "There is no indicia of reliability. If anything we have seen today shows, that is, if this young man said that the sun will rise tomorrow, the odds against it would be high." Defense counsel further argued that Whittingham had no credibility, so neither his prior statement nor his testimony at trial were reliable.

correctly determined that the statement was not so unreliable as to require that it be kept from the jury.

Finally, with respect to Whittingham's statement, the defendant argues that as a result of Whittingham's claimed memory loss, he functionally was not subject to cross-examination, as required under *Whelan* and the confrontation clause of the sixth amendment.[14] We do not agree.

"We begin by noting that . . . we exercise plenary review over whether the trial court properly concluded that the admission of the [statement] did not violate the defendant's confrontation clause rights . . . ." *State* v. *Simpson*, 286 Conn. 634, 651, 945 A.2d 449 (2008). "[W]hen the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements." (Internal quotation marks omitted.) Id., 652. Moreover, "a witness' claimed inability to remember earlier statements or the events surrounding those statements does not implicate the requirements of the confrontation clause . . . so long as the witness appears at trial, takes an oath to testify truthfully, and answers the questions put to him or her during cross-examination." *State* v. *Pierre*, supra, 277 Conn. 86.

While "limitations on the scope of examination . . . may undermine the process to such a degree that meaningful cross-examination . . . no longer exists . . . that effect is not produced by the witness' assertion of

[14] We note that where cross-examination is sufficient to comply with the threshold requirements of the constitution, it will satisfy the *Whelan* standard as well. See *State* v. *Pierre*, supra, 277 Conn. 75 ("hearsay rules and the [c]onfrontation [c]lause are generally designed to protect similar values . . . [but] [t]he [c]onfrontation [c]lause . . . bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule" [internal quotation marks omitted]); see also *State* v. *Eaton*, 59 Conn. App. 252, 265–66, 755 A.2d 973 (analyzing cross-examination prong of *Whelan* under confrontation clause principles), cert. denied, 254 Conn. 937, 761 A.2d 763 (2000).

memory loss—which . . . is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement." (Internal quotation marks omitted.) Id., 80–81. "Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." (Internal quotation marks omitted.) Id., 81.

As our Supreme Court further stated in *State* v. *Pierre*, supra, 277 Conn. 79, the "defendant's argument equates a declarant's inability or unwillingness to remember prior statements made to police with a general unavailability from cross-examination in its entirety." Whittingham was present at trial, took an oath and answered the questions asked of him by defense counsel. His asserted inability to remember the subject matter that the defendant hoped to reveal did not render him functionally unavailable for cross-examination. Despite Whittingham's asserted memory loss, the defense, during cross-examination, did have the opportunity to ask questions to highlight Whittingham's motives and biases. In fact, cross-examination, where he asserted that he remembered nothing from the afternoon of the incident, provided the jury with the basis to credit all or part of his prior statement or to decide that Whittingham's faulty memory warranted completely disregarding his prior statement. While the defendant ultimately was not satisfied with the content of Whittingham's responses on cross-examination, we do not find that the court's decision to admit into evidence the prior statement to police deprived the defendant of his rights under the confrontation clause. As the court properly evaluated the statement under both *Whelan* and the confrontation clause, we find no error in its admission as substantive evidence.

II

We turn next to the defendant's claim that the court lacked subject matter jurisdiction to modify his original sentence. We reject the defendant's claim.

The following additional facts are relevant to the resolution of this claim. Following the jury verdict, the court held a sentencing hearing at the conclusion of which it sentenced the defendant to five years with execution suspended, followed by three years probation for the first count of attempt to commit assault in the second degree; five years for the second count of attempt to commit assault; one year for the fourth count of interfering with a police officer; and three years for the fifth count of carrying a dangerous weapon. The sentence on each of these counts was ordered to run consecutively. The court stated that the total effective sentence was fourteen years, suspended after nine years, with three years of probation to follow. For the term of probation, the court imposed two specific conditions: the defendant was prohibited from possessing weapons and from having any contact with Esposito or Whittingham.

Less than a month after the court originally sentenced the defendant, the state brought to the attention of the court a defect in the structure of the sentence. During a hearing on the matter, the state explained that the court had attached the defendant's term of probation to his suspended sentence for his conviction on the first count of attempt to commit assault in the second degree, which would result in the defendant's probation running concurrently with his nine years of imprisonment. The office of probation had informed the state that with the sentence packaged in this way, under *State* v. *Moore*, 85 Conn. App. 7, 855 A.2d 1006, cert. denied, 271 Conn. 937, 861 A.2d 510 (2004), it could not execute the sentence intended by the court, that is, that

the defendant's term of probation would not be tolled until he was released from prison.[15]

In light of the defect in the sentence, and with no objection from the defendant,[16] the court adjusted the sentence to reflect its intent. Before imposing the adjusted sentence, the court assured both the defendant and his family that he would be serving no additional prison time as a result of the adjustment. The corrected sentence affected only the first and fifth counts: for count one, five years with execution suspended after one month followed by three years probation; for count five, two years and eleven months. During the resentencing, the court did not address whether the sentences were to run consecutively.

"We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *State* v. *Tabone*, 301 Conn. 708, 713–14, 23 A.3d 689 (2011). "Jurisdiction involves the power in a court to hear and determine the cause of action presented to it and its source is the constitutional and statutory provisions by which it is created." (Internal quotation marks omitted.) *State* v. *Lawrence*, 91 Conn. App. 765, 769, 882 A.2d 689 (2005), aff'd, 281 Conn. 147, 913 A.2d 428 (2007). "In the absence of statutory or constitutional provisions, the limits of its jurisdiction are delineated by the common law." *State* v. *Luzietti*, 230 Conn. 427, 431, 646 A.2d 85 (1994).

---

[15] In *State* v. *Moore*, supra, 55 Conn. App. 10, the defendant contended that "probation [may] be stayed only until the completion of incarceration for the same crime to which the probation applies." The court agreed with the defendant's contention. See id., 12–13.

[16] Defense counsel stated, "We're basically agreeing on whatever's gonna happen." We need not address whether this constitutes waiver, as the issue of subject matter jurisdiction "may not be waived by any party, and also may be raised by a party, or by the court sua sponte, at any stage of the proceedings, including on appeal." *Peters* v. *Dept. of Social Services*, 273 Conn. 434, 441, 870 A.2d 448 (2005).

"Under the common law, the [trial] court has continuing jurisdiction to correct an illegal sentence. . . . In Connecticut, that grant of jurisdiction is recognized and the procedure by which it may be invoked is regulated by Practice Book § 43-22."[17] (Citations omitted.) *State* v. *Lawrence*, supra, 91 Conn. App. 772–73. "For the court to have jurisdiction to consider the defendant's claim of an illegal sentence, the claim must fall into one of the categories of claims that, under the common law, the court had jurisdiction to review." Id., 773.

"Connecticut has recognized two types of circumstances in which the court has jurisdiction to review a claimed illegal sentence. The first of those [and the only circumstance relevant to this appeal] is when the sentence itself is illegal, namely, when the sentence either exceeds the relevant statutory maximum limits, violates a defendant's right against double jeopardy, *is ambiguous*, or is internally contradictory." (Emphasis added; internal quotation marks omitted.) Id., 773–74.

The total effective sentence articulated by the court, as compared to the court's itemization of its component parts, rendered the sentence ambiguous. As indicated by the record, the court intended, and the parties understood, that the defendant was to serve a total of nine years of incarceration followed by three years of probation with special conditions. However, the sentence as initially conveyed by the court, could be interpreted as either allowing the defendant to serve his probation while incarcerated, or attempting to toll the term of probation until his release. Ambiguity has long been known to mean "[c]apable of being understood in two or more possible senses or ways." (Internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537,

---

[17] Practice Book § 43-22 provides: "The judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner or any other disposition made in an illegal manner."

572, 816 A.2d 562 (2003) (partially superseded by General Statutes § 1-2z). Because the defendant's sentence, as originally imposed, could be understood to authorize two different outcomes for the defendant, it is ambiguous. Accordingly, we conclude that the court properly had jurisdiction to correct the defendant's sentence.

## III

Finally, we address the defendant's claim that there was insufficient evidence to sustain his conviction of two counts of attempt to commit assault in the second degree pursuant to §§ 53a-49 (a) (1)[18] and 53a-60 (a) (1).[19] We are not persuaded.

[18] The defendant refers to this subdivision of the General Statutes as "mistake of fact" attempt. This is a misnomer in two respects. First, we believe that the defendant means to refer to this subdivision as "factual impossibility" attempt, a concept formerly contained in this section of the statute. "Mistake of fact," however, is an affirmative defense to negate the intent element of a crime available under General Statutes § 53a-6 (a) "when one makes an erroneous perception of the facts as they actually exist." (Internal quotation marks omitted.) *State* v. *Beltran*, 246 Conn. 268, 274, 717 A.2d 168 (1998). Second, "factual impossibility" attempt was eliminated from the statutory scheme in 1971. See Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-49 (West 2007), commission comment ("[t]his section sweeps aside any consideration of the defense of impossibility, including the distinction between so-called factual and legal impossibility"). A more apt shorthand for this subdivision would be "attendant circumstances" attempt. General Statutes § 53a-49 (a) (1) defines "attendant circumstances" attempt as follows: "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . [i]ntentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be . . . ."

The defendant argues that the state should have charged him with "substantial step" attempt, defined in § 53a-49 (a) (2) as follows: "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[19] General Statutes § 53a-60 (a) (1) provides in relevant part: "A person is guilty of assault in the second degree when . . . [w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person . . . ."

The following additional facts are necessary to the resolution of this claim. Prior to jury deliberations, the court held a conference with defense counsel and the state to review proposed jury instructions. The court explained that for the two attempt to commit assault charges, the relevant part of the attempt statute, § 53a-49 (a) (1), would be read to the jury. Specifically, the court would instruct the jury that "a person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for the commission of the crime, he intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be." During the conference, neither party objected to this instruction. In closing argument, neither party explicitly addressed "attendant circumstances," focusing instead on the concept of attempt generally. The court ultimately charged the jury using the "attendant circumstances" language of § 53a-49 (a) (1) discussed during the conference.

"The standards by which we review claims of insufficient evidence are well established. When reviewing a sufficiency of the evidence claim, our courts apply a two-prong test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Jacques*, 53 Conn. App. 507, 520, 733 A.2d 242 (1999).

"It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable." (Internal quotation marks omitted.) Id. "On appeal, we do not ask whether there is a reasonable view of the evidence that would

support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [t]his court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) Id., 521.

An attempt "is an act or omission done with the intent to commit some other crime. The rationale is that while a defendant may have failed in his purpose, his conduct is, however, criminally culpable, and if carried far enough along causes a sufficient risk of harm to be treated as a crime in and of itself." *State* v. *Green*, 194 Conn. 258, 272, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). "[T]he attempt is complete and punishable, when an act is done with [the] intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause." (Internal quotation marks omitted.) Id., 276. "Under . . . § 53a-49 (a), [a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." (Internal quotation marks omitted.) *State* v. *Cox*, 293 Conn. 234, 240–41, 977 A.2d 614 (2009). Furthermore, a "jury could . . . [find a] defendant guilty under both" subsections of § 53a-49 (a). *State* v. *Green*, supra, 275.

The defendant argues that the state should have charged him with "substantial step" attempt, under

§ 53a-49 (a) (2), rather than with "attendant circumstances" attempt under § 53a-49 (a) (1). The question, however, presented by the defendant, and now before this court, is not whether the state would have had a better theory of the defendant's guilt under a different statutory provision. Instead, it is whether there is sufficient evidence to sustain the defendant's conviction pursuant to the statutory provision under which he was charged and the jury found him guilty.

The defendant relies on language from two Supreme Court cases, *State* v. *Cox*, supra, 293 Conn. 234, and *State* v. *Gonzalez*, 222 Conn. 718, 609 A.2d 1003 (1992), in support of his claim that there was insufficient evidence to sustain his conviction of attempt to commit assault under the "attendant circumstances" subdivision of the attempt statute.[20] Yet, the language in those

[20] The language the defendant cites originated partially in *Gonzalez* and was later quoted and expanded upon in *Cox*: "Each subdivision of § 53a-49 (a) sets forth an alternative way to commit attempt, and the difference between the subdivisions is significant. The first type, § 53a-49 (a) (1), deals with the situation where one engages in conduct which would constitute the offense if matters were as he perceived them; i.e., some mistake in fact prevents these from being a crime even though the actor intends to commit one. The second type, § 53a-49 (a) (2), involves carrying out in part some substantive portions of the proscribed conduct. . . . An instruction on [§ 53a-49 (a) (1)] should be given when the evidence indicates that a perpetrator failed to accomplish or complete all the elements of a particular crime solely because the attendant circumstances were not as the perpetrator believed them to be, rendering the commission of the crime impossible. Examples of a violation of § 53a-49 (a) (1) would be a pickpocket's failure to complete a larceny because his hand was in an empty pocket, or an attempt by an accused to bribe a juror but mistakenly approaching a nonjuror. . . . On the other hand, a court should charge on § 53a-49 (a) (2) when the evidence indicates that a perpetrator has done something which, under the circumstances as he believed them to be, is an act constituting a substantial step in a course of conduct planned to culminate in his commission of a particular crime. In other words, this sub[division] is directed at the more common attempt situations [wherein] the actor's conduct falls short of the completed offense for reasons other than impossibility." (Citations omitted; internal quotation marks omitted.) *State* v. *Cox*, supra, 293 Conn. 241–42; see *State* v. *Gonzalez*, supra, 222 Conn. 724–25.

cases cited by the defendant arises in the context of those defendants' respective challenges to the courts' jury instructions, not with respect to claims of insufficiency of evidence. The defendant makes no such instructional challenge with this appeal. His claim pertains only to the sufficiency of the evidence to sustain his conviction under the "attendant circumstances" subdivision of the statute.

The defendants in both *Cox* and *Gonzalez* claimed that their respective juries were charged with offenses under the incorrect subdivision of § 53a-49 (a). *State* v. *Cox*, supra, 293 Conn. 240; *State* v. *Gonzalez*, supra, 222 Conn. 721. While the courts in both of those cases found that the juries had been improperly instructed, the consequence of these findings was not reversal of the defendants' convictions under the erroneous subdivision. *State* v. *Cox*, supra, 244–45; *State* v. *Gonzalez*, supra, 725. Rather, in *Cox*, the court then conducted a sufficiency analysis under the subdivision pursuant to which the jury was instructed and charged.[21] *State* v. *Cox*, supra, 245–46. In *Gonzalez*, the majority found that the error was harmless beyond a reasonable doubt. *State* v. *Gonzalez*, supra, 726. As the instructions are not at issue in this appeal, we focus only on whether there was sufficient evidence for the jury reasonably to have concluded that the defendant was guilty of attempt to commit assault in the second degree under the "attendant circumstances" subdivision of § 53a-49 (a).

On the basis of the evidence presented in this case, viewed in the light most favorable to upholding the verdict of guilty, the jury reasonably could have concluded that the testimony regarding the defendant's

[21] The court in *Cox* found that there was insufficient evidence to sustain the verdict, as the state had not presented evidence of the attendant circumstances surrounding the attempted shooting in that case. *State* v. *Cox*, supra, 293 Conn. 247.

verbal and physical threats with a knife proved that the defendant intended to cause serious physical harm to Esposito and Montagnese. Similarly, the jury was free to find, on the evidence presented, that the defendant believed the attendant circumstances were such that he was free to act with impunity when he threatened Esposito with the knife and when he ultimately turned his knife on Montagnese. The jury reasonably could have determined, in light of the overwhelming testimony, that the defendant pursued both Esposito and Montagnese with laser-like focus and appeared not to register the presence of the police, that the defendant believed he was the only person armed and that he would be able to complete his assault on Esposito and Montagnese, but for the fact that he had misapprehended the situation and was ultimately shot by police. Given that the jury reasonably could have concluded that the evidence showed beyond a reasonable doubt that the defendant intended to cause serious physical injury to Esposito and Montagnese, and he would have if the attendant circumstances were as he believed them to be, we find that there is sufficient evidence to sustain the defendant's conviction of two counts of attempt to commit assault under § 53a-49 (a) (1).

The judgment is affirmed.

In this opinion FLYNN, J., concurred.

LAVINE, J., concurring. I write separately because I believe the case of *State* v. *Green*, 194 Conn. 258, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985), while controlling, deserves to be reconsidered by our Supreme Court. In *Green*, the defendant's intention to sexually assault a woman was thwarted because the zipper on her pants broke. Id., 260. Our Supreme Court concluded that the jury could have convicted the defendant under either prong

of the attempt statute: the "attendant circumstances" prong of General Statutes § 53a-49 (a) (1) or the "substantial step" prong of § 53a-49 (a) (2). *State* v. *Green,* supra, 276–77. It is my view that the "attendant circumstances" prong was not intended to apply to a situation in which unforeseen subsequent circumstances frustrate someone from achieving a criminal objective. Rather, the "attendant circumstances" prong was intended to abolish any defense of legal or factual impossibility. See Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-49 (a) (1) (West 2007), commission comment ("[t]his section sweeps aside any consideration of the defense of impossibility"); see also *State* v. *Cox,* 293 Conn. 234, 241–46, 977 A.2d 614 (2009) (differentiating § 53a-49 [a] [1] and [a] [2]); *People* v. *Dlugash,* 41 N.Y.2d 725, 726–27, 732–37, 363 N.E.2d 1155, 395 N.Y.S.2d 419 (1977) (discussing "attendant circumstances" under New York statute; section applied to defendant who shot dead body believing it to be alive); 4 C. Torcia, Wharton's Criminal Law (15th Ed. 1996) § 697, pp. 626–32; 21 Am. Jur. 2d 267–68, Impossibility as Defense § 156 (2008). I question whether the "attendant circumstances" provision ought to apply when an assailant is prevented from stabbing someone solely because a police officer shoots him.

Accordingly, I respectfully concur.