OSCAR HARVEY *v.* COMMISSIONER OF
CORRECTION
(AC 26875)

Gruendel, Rogers and Lavine, Js.

Argued September 27—officially released December 19, 2006

David B. Rozwaski, special public defender, for the appellant (petitioner).

Melissa Streeto Brechlin, assistant state's attorney, with whom, on the brief, were Michael Dearington, state's attorney, and Angela R. Macchiarulo, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

ROGERS, J. The petitioner, Oscar Harvey, appeals following the denial of certification to appeal from the judgment of the habeas court dismissing his petition for a writ of habeas corpus. The petitioner claims that the habeas court (1) abused its discretion in denying his petition for certification to appeal and (2) improperly dismissed the habeas petition. Specifically, the petitioner alleges that his trial counsel provided ineffective assistance by not filing a motion to suppress multiple statements that the petitioner made to the police. We dismiss the appeal.

In 2001, following a jury trial, the petitioner was convicted of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (2) and two counts of making a false statement in the second degree in violation of General Statutes § 53a-157b.[1] He received an effective sentence of twenty years imprisonment, execution suspended after eighteen years, to be followed by ten years of probation. The petitioner's conviction was affirmed on direct appeal. See State v. Harvey, 77

---

[1] The petitioner was acquitted of one count of tampering with a witness in violation of General Statutes § 53a-151.

Conn. App. 225, 822 A.2d 360, cert. denied, 265 Conn. 906, 831 A.2d 252 (2003).

The facts underlying the petitioner's conviction were recounted in the decision of this court disposing of that appeal: "During the evening of December 18, 1999, the [petitioner] drove A,[2] the victim's mother, to work at a department store. The [petitioner] had agreed to baby-sit A's twenty-two month old daughter (victim) at his apartment while A was at work. A testified that she called the [petitioner] twice from work to check on the victim. During their first conversation, the [petitioner] told A that the victim had removed her overalls and had put her finger in her vagina. In their second conversation, the [petitioner] again told A that the victim had put her 'hand up in her vagina.' At around midnight, the [petitioner] picked A up from work and dropped her off at his apartment; he did not stay. A testified that while changing the victim's diaper, she discovered blood and lots of baby powder in the dirty diaper. She immediately called the police.

"When Officer John McGrath of the Hartford police department arrived, he found A crying hysterically. McGrath testified that he observed a lot of baby powder and a 'pinkish tinge' discharge inside the victim's diaper. He further testified that A had told him that the [petitioner] might have sexually assaulted the victim.

"The victim was transported by ambulance to the Connecticut Children's Medical Center, where Kenneth Platt, a physician, examined her. Platt testified that he had observed vaginal bleeding and bruising, and a small laceration near the entrance of the victim's vagina. He further testified that the victim's injuries could not have

---

[2] In accordance with our policy of protecting the privacy interests of victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

been self-inflicted, but were consistent with a sexual assault by digital penetration.

"The jury also heard testimony from a friend of A. She testified that the [petitioner] and A had had a romantic relationship, and that the [petitioner] had told her that he was divorced and that his daughter was dead.

"On January 10, 2000, the [petitioner] voluntarily went to the police station for questioning. Prior to being questioned by Detective Steven DiBella and Detective William Long, the [petitioner] signed an acknowledgment form indicating that he had been advised of his *Miranda* rights.[3] Initially, the [petitioner] insisted that he did not know A, but later admitted that she was a former tenant. He also stated that he had never baby-sat the victim. DiBella testified that on further questioning, the [petitioner] confessed that he had been untruthful in his first statement because he did not want his wife to find out about his extramarital affair with A.

"In his second written statement, the [petitioner] admitted that he and A had had a sexual affair and that he had baby-sat the victim on the night in question. He also wrote that the victim took her clothes off and started to 'play with herself.' DiBella then told the [petitioner] that his version of the incident was not credible because the victim wore a buckled overalls outfit.

"The [petitioner] then decided to give a third written statement. In that statement, the [petitioner] confessed that he had removed the victim's clothes and diaper, and accidentally penetrated her vagina with his finger to see how it felt. He also wrote that when he finished the sexual assault, he put powder on the victim's genital area and put her diaper back on.

---

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

"The following day, the [petitioner] returned to the police station to give another statement. In that statement, he stated that A had used his daughter's social security number to get her job at the department store. At trial, the [petitioner] recanted the sworn statements he had made on January 10, 2000, testifying that he did not know A and that he never baby-sat the victim or touched her." *State* v. *Harvey*, supra, 77 Conn. App. 227–29. After his trial concluded, the petitioner was convicted and sentenced as previously stated.

On August 30, 2004, the petitioner filed an amended petition for a writ of habeas corpus alleging that his confinement was unlawful because his trial counsel had provided ineffective assistance in a number of ways. Pertinent to this appeal, he claimed that counsel was ineffective in failing to file a motion to suppress his January 10, 2000 statements to the police because those statements were not made in a voluntary manner.

On March 10, 2005, a hearing was held on the petition, at which the petitioner and his trial counsel, David Griffin, testified. The transcript of the petitioner's trial, his handwritten statements to the police and his signed *Miranda* waiver were submitted as evidence.

At the habeas hearing, the petitioner testified that after being contacted by the police, he made an appointment to speak with them at the police station. Upon arriving, he was taken to a small room on an upper floor that contained a table, chairs and some toys. He was accompanied by Detectives DiBella and Long. He was asked whether he wanted food or drink and was permitted to use the restroom.

According to the petitioner, the statement he made in which he confessed to assaulting the victim was elicited under coercive circumstances, was not voluntarily given and was false. Specifically, he claimed that he felt pressure from DiBella and Long to write what

the detectives wanted him to write and that one of the detectives grabbed him by his clothing when he stood up and started to leave the interview room, preventing him from departing. The petitioner testified that he was afraid because he saw that detective's gun at his side and was reminded of recent instances of police shooting civilians in Hartford, in particular black people, "for no reason." He believed that the only way he could leave was if he said what the detectives wanted to hear. The petitioner stated that he did not recall having been read his *Miranda* rights or signing the *Miranda* waiver form. He indicated that after he gave his third statement, the police allowed him to leave. The petitioner estimated that he was at the police station for a total of three to five and one-half hours during the evening. Aside from the incident in which a detective allegedly grabbed him by his clothing, he did not think that the police were rude. He stated that he voluntarily returned to the station the following day to speak further with the police because he believed that he had not been treated properly.

In response to questions about his background and experience, the petitioner confirmed that he was fifty-four years old at the time of his trial and had had about three years of college education. He could read, write and comprehend English well. At the time of his arrest, he was a minister who spoke on the radio and local cable television shows. Although he was born in Jamaica, he had lived in the United States since 1963. He had had some interaction with police and the court system in his dealings as a landlord but had no prior arrests. In testifying generally about his counsel's preparation for trial, the petitioner claimed that he never spoke with Griffin about his statements to police.

Griffin's testimony followed, and his account of the pretrial preparations differed from the petitioner's in many respects. In relevant part, Griffin testified that he

and his co-counsel discussed the statements with the petitioner and that there was no indication of any reason to file a motion to suppress. He stated that the petitioner insisted on testifying[4] and that he attempted to prepare the petitioner to be cross-examined regarding the statements but that the petitioner responded vaguely, saying "something like, he could explain that." According to Griffin, the petitioner did not tell him that the police had threatened him or pulled on his clothing until just before taking the witness stand. Griffin acknowledged that police coercion was a ground for suppression of a statement and testified further that had the petitioner told him "at any point in time prior to his hitting the witness stand" that his confession had been coerced, he would have filed a motion to suppress.

In a March 29, 2005 memorandum of decision, the court dismissed the petition. The court concluded that there was no evidence to support the petitioner's claim that had a motion to suppress his statements been filed, it would have been granted. Specifically, it found that the evidence presented showed that the petitioner was given *Miranda* warnings, that he voluntarily waived his rights, that he gave contradictory statements to the police and admitted having committed the charged conduct, that he voluntarily went to the police station and voluntarily left it after giving his statements, and that he was not in custody when he voluntarily gave those statements. The court noted further that most of these questions had been decided adversely to the defendant in his criminal trial and that those decisions were fully supported by the evidence presented. It concluded finally that there was no evidence that Griffin had been

---

[4] According to Griffin, the petitioner was informed that his statements made the case against him very strong, but he refused to accept a plea offer and insisted on testifying because he believed that the state would be unable to retrieve the victim's mother from Jamaica to testify and, further, that he could explain the statements.

ineffective in his representation of the petitioner. This appeal followed.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on its merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . .

"In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . [and] [r]eversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . As to reversal on the merits, [t]he standard of review of a habeas court's denial of a petition for a writ of habeas corpus that is based on a claim of ineffective assistance of counsel is well settled. To prevail on a claim of ineffective assistance of counsel, a habeas petitioner generally must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. See *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)." (Citations omitted; internal quotation

marks omitted.) *Greene* v. *Commissioner of Correction*, 96 Conn. App. 854, 856–57, 902 A.2d 701, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006).

The petitioner claims that the court abused its discretion in denying certification to appeal because the issue of whether his counsel was ineffective by failing to file a motion to suppress his statements to the police is one that is debatable among jurists of reason, could have been resolved differently and warrants further consideration. We do not agree.

"In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious . . . ." *United States* v. *Matos*, 905 F.2d 30, 32 (2d Cir. 1990). Moreover, if that showing is made, there also "must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." Id.

The use of an involuntary confession in a criminal trial is a denial of due process of law. *State* v. *Azukas*, 278 Conn. 267, 289, 897 A.2d 554 (2006). "In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the petitioner's] will to resist and bring about confessions not freely self-determined . . . ." (Internal quotation marks omitted.) Id., 290.

In evaluating the voluntariness of a particular confession, a court considers "both the characteristics of the accused and the details of the interrogation." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 720, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). "Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education;

his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the federal constitution,[5] however, coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . ." (Internal quotation marks omitted.) *State* v. *Bjorklund*, 79 Conn. App. 535, 555, 830 A.2d 1141 (2003), cert. denied, 268 Conn. 920, 846 A.2d 882 (2004).

As to personal characteristics, the evidence before the habeas court demonstrated that the petitioner was a savvy individual not likely to be easily intimidated by law enforcement officials. He was mature in years, well educated, a longtime resident in a position of community leadership and, in his capacity as a landlord, had had substantial dealings with the police and the court system. See *State* v. *Banks*, 58 Conn. App. 603, 614, 755 A.2d 279 (confession voluntary where defendant "well over the age of eighteen" and "a literate, intelligent and articulate man"), cert. denied, 254 Conn. 923, 761 A.2d 755 (2000). In regard to the petitioner's claimed fears stemming from his knowledge of unspecified police shootings of civilians "for no reason," there is no indication that DiBella or Long put this thought in the petitioner's head and the petitioner points to no evidence that the police knew about or took advantage of his fears. See *Bae* v. *Peters*, 950 F.2d 469, 475 (7th Cir. 1991). "Absent improper police coercion, a defendant's mental state does not render a confession involuntary under the due process clause. *Colorado* v. *Connelly*, 479 U.S. 157, 163–67, [107 S. Ct. 515, 93 L. Ed. 2d 473] (1986) . . . ." (Citation omitted.) *Bae* v. *Peters*, supra, 475; see

[5] The petitioner does not argue that the state constitution provides criminal defendants with additional protections in determining the voluntariness of a confession. Accordingly, our review is limited to a federal constitutional analysis. See *State* v. *Pinder*, 250 Conn. 385, 418 n.31, 736 A.2d 857 (1999).

also *State* v. *Rosa*, 170 Conn. 417, 424, 365 A.2d 1135 ("state of mind which renders . . . a statement involuntary and hence inadmissible is that induced by mistreatment, threats, promises, physical or mental abuse which deprives an otherwise rational mind of the exercise of its free will and powers of decision and discernment" [internal quotation marks omitted]), cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976).

As to the circumstances of the petitioner's detention, the evidence showed that he was not questioned by police for an unduly lengthy period; see, e.g., *State* v. *Carter*, 189 Conn. 631, 638, 458 A.2d 379 (1983) (holding that eight hours, "though substantial in duration, does not remotely approach the length of those interrogations held to be so objectionable on that ground among others as to warrant reversal of a finding by a trial court that a confession was voluntary"); nor was he deprived of food, drink or use of restroom facilities. He arrived and departed the police station of his own volition and returned voluntarily by himself the following day. See *State* v. *Smith*, 42 Conn. App. 41, 46, 680 A.2d 1340 (1996) (defendant's statement voluntary where, inter alia, he "went to the police station by his own means and cooperated with the police"). Moreover, although the petitioner stated during his habeas testimony that he did not recall signing the *Miranda* waiver form that was part of the record, he admitted during his criminal trial testimony that he had executed that form. A petitioner's "waive[r] [of] his *Miranda* rights before giving any statements [is] a circumstance that is relevant to a finding of voluntariness." *State* v. *Lapointe*, 237 Conn. 694, 734, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

Although the petitioner claimed, both during his trial testimony and at the habeas hearing, that Detectives DiBella and Long coerced him into giving false statements by grabbing his clothing, displaying a weapon

and preventing him from leaving the interview room, the detectives both testified to the contrary at trial, and the jury that heard that testimony firsthand determined that the petitioner's version was not credible.[6] See *State v. Hawthorne*, 176 Conn. 367, 370–71, 407 A.2d 1001 (1978) (trier's province to resolve credibility issue concerning circumstances of police interview). Accordingly, it is unlikely that a court considering a suppression motion would have found differently. As to the petitioner's claim that he felt pressure from the detectives to write what they wanted him to write, there is no indication that they pressed him to confess falsely, and "[e]ncouraging a criminal suspect to tell the truth, when no promises or threats have been made, does not alone make a confession involuntary." *State v. Chung*, 202 Conn. 39, 55, 519 A.2d 1175 (1987); see also *State v. Lapointe*, supra, 237 Conn. 732 (police statements of disbelief did not render confession involuntary).[7] In sum, neither the petitioner's personal characteristics nor the circumstances of his questioning indicate that his will was overborne and his capacity for self-determination critically impaired. See *State v. Reynolds*, 264 Conn. 1, 55, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

Finally, Griffin testified, and the petitioner did not dispute, that the petitioner did not inform him until just

---

[6] DiBella testified that he made it clear to the petitioner that he was free to leave the interview room and did not have to speak to DiBella if he preferred otherwise. Long testified that he never grabbed the petitioner's clothing, nor did he observe DiBella doing so. Both DiBella and Long stated that they never threatened the petitioner or tried to prevent him from leaving the interview room. They further testified that they did not wear their weapons while interviewing the petitioner and that they never touched the petitioner. Conversely, the petitioner testified consistently with the claims he made during the habeas hearing.

[7] DiBella testified that prior to questioning the petitioner, he had interviewed the victim's mother and viewed the medical reports resulting from the victim's examination. Accordingly, he had a basis for disbelieving the petitioner's initial version of the events in question.

before taking the witness stand that he considered his confession to have been coerced.[8] Given the fact that there was nothing about the characteristics of the petitioner or the conditions of his questioning that suggested coercion, it cannot be said that Griffin performed deficiently by failing to file a suppression motion for which there was no objective basis. Under the foregoing circumstances, we are unable to conclude that it is debatable among jurists of reason whether the petitioner's counsel was ineffective for failing to file a motion to suppress the petitioner's statements to police in which he confessed to assaulting the victim.

The appeal is dismissed.

In this opinion the other judges concurred.

---

[8] We note that the trial transcripts reveal that at this point, all of the petitioner's statements already had been admitted into evidence along with DiBella's testimony as to the surrounding circumstances.