******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOHNNIE ARTHUR *v.* COMMISSIONER
OF CORRECTION
(AC 37403)

Sheldon, Keller and Flynn, Js.

*Argued October 13, 2015—officially released January 26, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Stephen Lebedevitch*, with whom, on the brief, was
*Stephanie M. O'Neil*, for the appellant (petitioner).

*Rocco A. Chiarenza*, assistant state's attorney, with
whom, on the brief, were *Kevin D. Lawlor*, state's attor-
ney, and *Erika L. Brookman*, assistant state's attorney,
for the appellee (respondent).

*Opinion*

KELLER, J. Upon a grant of certification to appeal, the petitioner, Johnnie Arthur, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court's decision should be reversed because that court erred by not concluding that the petitioner's trial counsel, Attorney Lawrence Hopkins, rendered ineffective assistance based upon (1) the manner in which he addressed evidence related to the cellular telephone (cell phone) records of the petitioner's girlfriend, which were offered into evidence by the state and admitted at the petitioner's criminal trial,[1] and (2) his failure to call as a trial witness a taxi driver who was present at the scene of the crime. We affirm the judgment of the habeas court.

The following procedural history and facts are relevant to the present appeal. In 2009, the petitioner was convicted, following a jury trial, of (1) attempt to commit murder, (2) assault in the first degree, (3) criminal possession of a firearm, and (4) carrying a pistol or revolver without a permit. This court, in affirming the petitioner's conviction on direct appeal, *State* v. *Arthur*, 128 Conn. App. 371, 18 A.3d 610, cert. denied, 302 Conn. 910, 23 A.3d 1249 (2011), stated that the jury could have reasonably found the following facts. "On the evening of September 29, 2007, the victim, Andrew Garnett, attended a party at the Sports Haven nightclub in New Haven with friends, including Dionte Dixon. While there, they met Nancy Sonemaneevong, Barbara 'Shanita' Green and the [petitioner's] girlfriend, Robin DiBenedetto. Green informed Dixon that she had a crush on his friend, Eugene Wright, and Dixon arranged for her to meet Wright later that evening. When the party ended, those individuals departed for Wright's apartment at 30 Glade Street in West Haven. Dixon drove his own car, the victim rode in a second vehicle with other friends, and DiBenedetto drove Sonemaneevong and Green in her red Pontiac Grand Am. At that time, DiBenedetto was speaking with the [petitioner] on her cellular telephone.

"When the vehicles arrived at the parking lot at 30 Glade Street in the early morning hours of September 30, 2007, Green immediately entered Wright's apartment. At that time, the victim and Dixon entered the Pontiac Grand Am and began flirting with DiBenedetto and Sonemaneevong. When Sonemaneevong needed to use a bathroom, Dixon escorted her into Wright's apartment. The victim remained in the vehicle with DiBenedetto, who still was on the telephone with the [petitioner].

"A bystander in the parking lot, Jamie Henderson, observed a man he knew as 'Drew' speaking to the female driver of the red Pontiac vehicle. He then wit-

nessed a gray Ford Taurus enter the parking lot, from which a male wearing a dark colored hoodie and hat emerged looking 'like he meant business.' With a hand in the hoodie, the man asked DiBenedetto to leave with him, and she refused. The victim informed the man that '[s]he good. She with us.' The man then fired multiple gunshots at him from close range. As the victim crawled on the ground, the Ford Taurus and the Pontiac Grand Am fled the scene.

"Officer Radames Gonce of the West Haven police department, who at the time was responding to an unrelated call nearby, heard the gunshots emanate from the Glade Street area. As Gonce drove toward Glade Street, he saw several vehicles driving away at a high rate of speed, including a gray Ford Taurus with a New York license plate. When he arrived at the parking lot outside Wright's apartment, Gonce found the victim lying on the ground. The victim subsequently was transported by ambulance to Yale-New Haven Hospital, where he was treated for life threatening injuries that included, inter alia, a collapsed lung, three gunshot wounds to the chest and one gunshot wound to his left thigh. Following emergency surgery, the victim recuperated in the hospital for seven days.

"While investigating the scene of the shooting, Detective Anthony Simone of the West Haven police department learned that the red Pontiac Grand Am had been located and asked the operator to return to the Glade Street parking lot. When the vehicle arrived, the operator was identified as DiBenedetto, who then was transported to police headquarters. Simone subsequently interviewed Henderson, Sonemaneevong and Green, from which he learned that DiBenedetto's boyfriend may have been involved in the shooting. He then interviewed DiBenedetto, who was uncooperative and identified her boyfriend only as 'Johnnie.' Further investigation revealed that DiBenedetto had been talking on her cellular telephone with the [petitioner] up to the time of the incident and that she had two cellular telephones registered in her name, both of which were used during that conversation. Telephone records, which were admitted into evidence at trial, established that DiBenedetto's initial conversation in the early morning hours of September 30, 2007, lasted forty-one minutes and three seconds, from 3:10 a.m. to 3:51 a.m. Telephone records also established that although the signal from DiBenedetto's other telephone was routed through a cell tower in New Haven at 3:10 a.m., it was routed through a tower on Campbell Avenue in West Haven from 3:51 a.m. to 3:56 a.m. The Campbell Avenue tower is in the vicinity of Glade Street and was used by both of DiBenedetto's cellular telephones at that time. Additional calls between DiBenedetto's two telephones were made at 3:52 a.m., 3:55 a.m. and 3:57 a.m. The police received a 911 call reporting the shooting at 3:57 a.m.

"Simone's investigation also revealed that DiBenedetto lived at 719 Orchard Street in New Haven with the [petitioner]. When police arrived at that property on the day of the shooting, they found a silver Ford Taurus with a New York license plate in the backyard. Gonce arrived later and confirmed that the vehicle looked like the one he observed fleeing the Glade Street area moments after the shooting. The police seized the vehicle, and a search revealed a cellular telephone and a photograph of the [petitioner] with friends at what appeared to be the party at the Sports Haven nightclub hours earlier. The police also learned that DiBenedetto had rented the vehicle from Enterprise Rental Car from September 28, 2007, through October 1, 2007.

"When Simone interviewed the [petitioner], he confirmed that he had attended the party at the Sports Haven nightclub a day earlier. The [petitioner] stated that he attended with friends and that he did not drive there 'because he doesn't drive.' The [petitioner] did not provide any further information to police at that time. Nonetheless, Brenda Ollison, DiBenedetto's upstairs neighbor at 719 Orchard Street, testified at trial that she observed the [petitioner] driving the Ford Taurus on the weekend in question.

"As a result of their preliminary investigation, the police obtained a description of the person who had shot the victim. Simone detailed that description at trial as follows: 'Black male, approximately five foot nine, at the time wearing dark pants with a design on the rear pockets, a dark hooded sweatshirt with red drawstrings and a red and white design on the front, and a black fitted baseball style cap.' DiBenedetto's sister, Lori Ann Johnson, testified that she had cared for DiBenedetto's son on the evening of September 29, 2007, so that DiBenedetto could attend the party at the Sports Haven nightclub. When Johnson went to DiBenedetto's residence at 719 Orchard Street on October 1, 2007, DiBenedetto and the [petitioner] were there. Johnson observed the [petitioner's] recently washed clothes on a chair. She saw a black 'zip-up,' a black tee shirt and dark jeans, which she stated the [petitioner] had worn to the Sports Haven nightclub. When shown the outfit worn by the [petitioner] in the photograph found in the search of the Ford Taurus, Johnson identified it as the same outfit she had seen drying on the chair at 719 Orchard Street. Johnson further testified that DiBenedetto drove a 'red Pontiac Grand Am GT' at the time of the shooting.

"While recovering from surgery at the hospital, the victim spoke with Detective Usha Carr of the West Haven police department. Carr testified that the victim stated that, on the night of the shooting, he was 'hanging out' in the parking lot at 30 Glade Street with friends. While the victim was chatting with a white female in a red Pontiac Grand Am, 'a black male drove up' in a

silver Ford Taurus. The man repeatedly told the woman with whom the victim had been speaking to leave with him. The victim told the man that '[s]he good. She with us.' The victim's next recollection was the smell of gunpowder. During the interview, Carr showed the victim a photographic array, informing him that the shooter 'might or might not be' in the array. The victim selected the [petitioner's] photograph as that of his assailant. The victim refused to sign the photographic array or to provide a recorded statement, however, because he did not want to be labeled a 'snitch.' At trial, the victim identified the [petitioner] in court as the individual that he had selected from the photographic array.

"The [petitioner] thereafter was arrested and charged with criminal attempt to commit murder, assault in the first degree, criminal possession of a firearm and carrying a pistol or revolver without a permit. While incarcerated at the MacDougall-Walker Correctional Institution, the [petitioner] received a visit from DiBenedetto and his mother, Judith Wright, on January 23, 2009. The visit transpired in a noncontact area, which contains 'a glass that separates [the inmate from the visitors] with a booth and the visitors are on the opposite side of them and they make contact through two . . . phone headsets.' On the date in question, Correction Officer Rudolfo Santana observed the [petitioner] 'looking over his shoulder, towards where I was standing, kind of suspiciously, sort of nervous. So I started observing him a little bit more closely. I noticed that he was moving his right hand, like trying to hide something, bringing it up, bringing it down, and every time I looked towards him, he would bring it down. So I approached him from the backside and I noticed he had his right hand against the window with a piece of paper and I asked him for it. He handed it to me with no problem. I looked at the piece of paper. I saw it had some information on it, so I stated to him to continue with his visit, and I walked out of that particular area there. He [stood] up, follow[ed] me, and asked me what I was going to do with the paper and [told me] to throw it away, and I gave him a direct order to go sit back down and continue with his visit.' Santana identified the [petitioner] in court as that inmate. Santana further testified that he brought the paper to a supervisor immediately.

"The paper was admitted as a full exhibit at trial, and the clerk of court read its contents. The paper listed two telephone numbers . . . and then stated: '(NAME) Drew Tell him please don't cooperate with the courts, [a]nd to tell his friends not too. And if [I] would of known what [I] know now it wouldn't never happened, [d]on't never tell him your real name ok ma. Ask him if he could help me, by not cooperating, cry too ma, don't talk to nobody but him ma, ok just him. I need that nigga to not cooperate with them anymore. [I]f

that's done, with the victim theirs no case.' At trial, the victim testified that, after the shooting, he learned that the [petitioner] was his cousin.

"At the conclusion of the state's case in his criminal trial, the [petitioner] moved for a judgment of acquittal on all charges, arguing primarily that the state had not proven beyond a reasonable doubt that the [petitioner] had shot the victim. The court denied the motion, and the jury thereafter found the [petitioner] guilty on all counts. The court rendered judgment accordingly and sentenced the [petitioner] to a total effective term of twenty-five years incarceration." (Footnotes omitted.) Id., 373–79.

The petitioner filed a petition for a writ of habeas corpus in January, 2012, and then filed an amended petition on November 26, 2013. In the amended petition, the petitioner claimed that he received ineffective assistance of counsel during his criminal trial based upon the following six failures of Attorney Hopkins: (1) his failure to request, pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), a hearing (*Porter* hearing) with respect to the cell phone evidence; (2) his failure to object to Detective Simone's opinion testimony that the aforementioned cell phone records placed the petitioner on Glade Street during the shooting; (3) his failure to properly cross-examine a state's witness, Susan Johnson,[2] who offered testimony pertaining to, inter alia, the process of determining the approximate location of cell phone users based upon cell site data and cell phone records; (4) his failure to present his own expert witness at trial to rebut the state's cell phone evidence; (5) his failure to investigate and call as a witness, Alfred Kidd, a taxi driver who had been present at the scene of the shooting; and (6) his failure to properly cross-examine two of the state's witnesses who were police officers who responded to the scene of the shooting.[3]

The respondent, the Commissioner of Correction, denied the substance of all of the petitioner's claims in a return filed on December 31, 2013. On May 13, 2014, the court, *Cobb, J.*, held an evidentiary hearing in the habeas matter, during which the petitioner presented exhibits and called the following witnesses: (1) Attorney Hopkins; (2) Attorney Aaron J. Romano, an experienced criminal defense attorney; (3) Kidd; (4) Joseph Sierra, a custodian of records for T-Mobile; and (5) Justin Darrow, a radio-frequency engineer with expertise in cell phone data. Both parties also filed pretrial briefs and the petitioner filed a posttrial brief. On October 27, 2014, the habeas court issued a memorandum of decision wherein it denied the petitioner's amended petition. The petitioner thereafter sought certification to appeal to this court, which the habeas court granted on November 3, 2014. This appeal followed. Additional

facts will be set forth as necessary.

"We begin our discussion by noting that the effectiveness of an attorney's representation of a criminal defendant is a mixed determination of law and fact that . . . requires plenary review . . . . The sixth amendment to the United States constitution guarantees a criminal defendant the assistance of counsel for his defense. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 458, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006); see also *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (discussing performance and prejudice prongs necessary to establish ineffective assistance claim).

I

We first address the petitioner's claims that the habeas court improperly denied his habeas petition by not concluding that Attorney Hopkins rendered ineffective assistance in various ways related to the manner in which he addressed the cell phone evidence admitted at trial. On appeal, the petitioner claims that he received ineffective assistance of counsel because of the following: (1) Attorney Hopkins failed to "research and investigate" the limitations of the cell phone records, which impaired his ability to properly defend the petitioner; (2) Attorney Hopkins failed to request a *Porter* hearing to challenge the state's argument that the cell phone records provided data that could be used to determine the movements of the petitioner on the night of the shooting; (3) Attorney Hopkins failed to consult with and to present a cell phone expert to testify regarding the limitations of the cell phone records, which impaired his ability to properly defend the petitioner; and (4) Attorney Hopkins opted not to challenge, in any manner, the cell phone evidence that the state offered, which generally revealed counsel's unreasonable and inadequate investigation.[4]

In contesting the petitioner's ineffective assistance claim as it relates to the cell phone evidence, the respondent argues the following: (1) that the petitioner's claim that Attorney Hopkins inadequately investigated the

limitations of cell phone records should not be addressed by this court on appeal because it was never raised in his operative habeas petition and that ground of ineffectiveness was not considered by the habeas court; (2) that the petitioner failed to establish ineffective assistance based upon Attorney Hopkins' failure to request a *Porter* hearing on the cell phone evidence or to present his own expert on the cell phone evidence; and (3) that the petitioner failed to establish ineffective assistance based upon Attorney Hopkins' failure to properly cross-examine Susan Johnson or Detective Simone. Alternatively, the respondent claims that even if this court concludes that Attorney Hopkins rendered ineffective assistance in relation to the cell phone evidence under *Strickland*'s performance prong, the habeas court's decision should be affirmed because the petitioner cannot satisfy *Strickland*'s prejudice prong with respect to Attorney Hopkins' handling of the cell phone evidence. We agree with the respondent.

A

We decline to review the petitioner's claim that he received ineffective assistance of counsel based upon Attorney Hopkins' failure to research and investigate the limitations of the cell phone evidence. "[A] habeas petitioner is limited to the allegations in his petition, which are intended to put the [respondent] on notice of the claims made, to limit the issues to be decided, and to prevent surprise." (Internal quotation marks omitted.) *Moye* v. *Commissioner of Correction*, 316 Conn. 779, 789, 114 A.3d 925 (2015). An appellate court will decline to review a habeas petitioner's claim where the petitioner raises it for the first time in appealing from the habeas court's decision, where the habeas court did not address the claim in its decision, and where the petitioner neither raised such claim in his operative habeas petition nor sought an articulation of the habeas court's decision with respect to such claim. See *Harris* v. *Commissioner of Correction*, 271 Conn. 808, 843–44, 860 A.2d 715 (2004); *Bertotti* v. *Commissioner of Correction*, 136 Conn. App. 398, 404, 44 A.3d 892, cert. denied, 307 Conn. 901, 53 A.3d 217 (2012); *Velasco* v. *Commissioner of Correction*, 119 Conn. App. 164, 166 n.2, 987 A.2d 1031, cert. denied, 297 Conn. 901, 994 A.2d 1289 (2010); *Copeland* v. *Warden*, 26 Conn. App. 10, 13–14, 596 A.2d 477 (1991), aff'd, 225 Conn. 46, 621 A.2d 1311 (1993).

In his amended petition for a writ of habeas corpus, the petitioner did not specifically claim that Attorney Hopkins rendered ineffective assistance based upon his failure to investigate the limitations of the cell phone evidence. To the contrary, as his petition relates to the cell phone evidence, the petitioner merely claimed that he had received ineffective assistance because Attorney Hopkins (1) failed to request a *Porter* hearing with respect to the cell phone evidence, (2) failed to object

to testimony pertaining to the cell phone evidence, (3) failed to properly cross-examine a state's witness pertaining to the cell phone evidence, and (4) failed to call an expert witness on cell phone evidence. Moreover, in the memorandum of decision denying the habeas petition, the habeas court did not address any claims pertaining to Attorney Hopkins' alleged failure to *investigate* the limitations of the cell phone evidence. Rather, consistent with the petition, the court addressed the claim as involving failures to request a *Porter* hearing on the cell phone evidence, to cross-examine certain witnesses adequately concerning this evidence, and to object to portions of these witnesses' testimony. Thus, we conclude that the petitioner's claim that he received ineffective assistance based upon Attorney Hopkins' failure to investigate the limitations of the cell phone evidence is not properly before this court and we decline to address its merits.

B

We now address the petitioner's claim that he received ineffective assistance of counsel because Attorney Hopkins failed to request a *Porter* hearing regarding the cell phone evidence offered by the state to show the petitioner's movements on the night of the shooting. We conclude that the habeas court properly determined that the petitioner failed to prove prejudice as a result of Attorney Hopkins' failure to request a *Porter* hearing. The following additional facts are relevant to our review of the petitioner's claim.

In its effort to establish the movements of the petitioner during the early morning hours of September 30, 2007, the state offered at trial exhibits and testimony pertaining to the cell phone evidence. Investigation revealed that DiBenedetto had been talking on her cell phone with the petitioner up to the time of the incident and subsequent to it, and that she had two cell phones registered in her name, both of which were used during that conversation. The state subpoenaed and offered as exhibits the T-Mobile call detail records for the calls placed between DiBenedetto's two cell phones prior to, at and subsequent to the time of the shooting. These records indicated when calls were made and which cell towers were used to transmit the calls. During its direct examination of Detective Simone about these cell phone records, the state elicited his testimony that the records showed that both of DiBenedetto's cell phones were on Glade Street at about the time of the shooting.

In conjunction with its offer of the cell phone records at trial, the state, on the day after its presentation of Detective Simone's testimony, presented testimony from a T-Mobile custodian of records, Susan Johnson. During her direct examination, she read from the records and testified that during the early morning hours of September 30, 2007, the records for DiBenedetto's cell phones indicated that a call was made from

one of those cell phones to the other of those cell phones at 3:10 a.m. and that this call lasted until 3:51 a.m. Furthermore, Susan Johnson testified that the cell phone placing the call at 3:10 a.m. initially transmitted its signal through a cell tower located at 159 Middletown Avenue in New Haven, which is near the Sports Haven nightclub. She also testified that this same phone, at 3:57 a.m., transmitted its signal through another cell tower located at 950 Campbell Avenue in West Haven, which is near the location at which the shooting occurred. During his examination of Susan Johnson, Attorney Hopkins elicited her testimony that the records showed that the same cell phone later placed a call at 4:19 a.m. and that it transmitted its signal through the cell tower located at 159 Middletown Avenue in New Haven at that time.[5] After Attorney Hopkins' examination of Susan Johnson and his initial objection to the state's offer of the cell phone records on relevance grounds, the records ultimately were admitted as a full exhibit. At no time did Attorney Hopkins request the trial court to conduct a *Porter* hearing.

"In *State* v. *Porter*, supra, 241 Conn. 57, our Supreme Court adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In so doing, our Supreme Court noted two threshold requirements to the admissibility of scientific evidence. First, that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity. . . . Second, the scientific evidence must fit the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." (Internal quotation marks omitted.) *Scandariato* v. *Borrelli*, 153 Conn. App. 819, 826, 105 A.3d 247 (2014). "In *Porter* we recognized that *Daubert*'s vagueness as to how and when to apply the factors of the [*Daubert*] test was necessary. . . . In order to maintain flexibility in applying the test, we did not define what constitutes scientific evidence. . . . Consequently, our initial inquiry is whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*." (Citations omitted; internal quotation marks omitted.) *State* v. *Griffin*, 273 Conn. 266, 276, 869 A.2d 640 (2005). The hearing in which this judicial assessment occurs is referred to as a *Porter* hearing.

In the present case, we conclude that the habeas court properly determined that the petitioner failed to prove prejudice and ineffective assistance of counsel from Attorney Hopkins' failure to request a *Porter* hear-

ing regarding the cell phone evidence. The petitioner argues in his brief that the state's use of the cell phone evidence as evidence of his movements prior to, at the time of, and after the shooting was improper and should have been challenged using a *Porter* hearing. The petitioner also contends that if Attorney Hopkins had requested, and if the trial court had held, a *Porter* hearing to examine the reliability of the cell phone evidence, its admissibility would have been limited by disallowing its use for the purpose of showing to the jury that the petitioner was on Glade Street when the shooting occurred. We fail to see how Attorney Hopkins' failure to request a *Porter* hearing prejudiced the petitioner at trial.

First, we observe that the petitioner failed to present evidence that the outcome of a request for a *Porter* hearing would have been favorable to the defense. During the petitioner's habeas proceedings, he presented the testimony of Attorney Romano, an attorney with experience in criminal defense matters. Attorney Romano testified that he routinely files motions for *Porter* hearings when prosecutors offer cell phone evidence of this nature but that *none of his motions has been granted*. Attorney Hopkins also testified that, in his experience, cell phone records of this type are generally admitted into evidence. The petitioner also presented the testimony of a T-Mobile custodian of records and a radio-frequency engineer at his habeas proceedings in order to refute the state's cell phone evidence. The habeas court found that this testimony failed to establish that the trial court would have granted the petitioner a *Porter* hearing on the cell phone evidence had Attorney Hopkins moved for one. The testimony presented by the petitioner's witnesses at his habeas proceedings did not help to demonstrate that the cell phone evidence would be novel scientific evidence so as to require a *Porter* hearing prior to its admission. Thus, we conclude that the petitioner has failed to show that he was prejudiced by Attorney Hopkins' failure to request a *Porter* hearing because he failed to prove to the habeas court that such a request would have any merit or would have changed the outcome of his trial.[6] See *Harvey* v. *Commissioner of Correction*, 98 Conn. App. 717, 725, 912 A.2d 497 (2006) (concluding that for habeas petitioner to show trial counsel was ineffective due to counsel's failure to file motion to suppress, petitioner must demonstrate that underlying motion is meritorious and that outcome of trial would have been different had motion been granted), cert. denied, 281 Conn. 914, 916 A.2d 55 (2007).

Second, we conclude on the basis of our review of the evidence that the petitioner cannot demonstrate prejudice because the cell phone evidence was not significant to the state's case. See *Strouse* v. *Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991) (holding no prejudice when habeas petitioner's ineffective assistance appeal

arose from trial where overwhelming evidence of guilt had been admitted aside from alleged deficiencies of counsel); *Stepney* v. *Commissioner of Correction*, 129 Conn. App. 364, 367–68, 19 A.3d 1262 (2011) (holding habeas petitioner's counsel was not ineffective where alleged shortcomings were deemed strategic decisions and were made in face of overwhelming evidence of petitioner's guilt), cert. denied, 315 Conn. 907, 105 A.3d 236 (2014). Specifically, we agree with the habeas court's finding that there was other probative evidence linking the petitioner to the shooting, namely, (1) the victim's identification of the petitioner as the shooter in a photographic array only days after the shooting had occurred and his subsequent confirmation of that identification at trial, and (2) the petitioner's letter from prison wherein he essentially admitted that he had committed the crime. *State* v. *Arthur*, supra, 128 Conn. App. 373–78.[7]

## C

Next, we address the petitioner's claim that he received ineffective assistance of counsel because Attorney Hopkins chose not to challenge the cell phone evidence. Specifically, the petitioner claims that Attorney Hopkins rendered ineffective assistance by not objecting—other than on relevance grounds—to the cell phone evidence or to the testimony of Susan Johnson or Detective Simone about such evidence, and by not adequately cross-examining these witnesses on this same evidence.[8] The following additional facts are relevant to our resolution of this claim. On the day before the state offered Susan Johnson's testimony on the cell phone evidence at trial to show that both of DiBenedetto's cell phones were being used at or about the time at which the shooting occurred, and that they were both using cell towers in West Haven and New Haven during that time period, the state elicited testimony from Detective Simone. Detective Simone testified that ex parte search warrants were executed on T-Mobile for DiBenedetto's cell phone records and that "[t]he goal in obtaining those records was to get the call detail and call times, as well as cell site locations, which would identify the area [in] which the calls were placed."[9] The state's direct examination of Detective Simone as it related to the cell phone records then proceeded as follows:

"[The Prosecutor]: And what are you able to tell, with regard to cell site location?

"[Detective Simone]: We are given a longitude-latitude and you were able to pinpoint where the exact cell tower in any given location was located. . . .

"[The Prosecutor]: Okay. And based upon your investigation, what were you able to determine?

"[Detective Simone]: We were able to determine that the forty-two minute phone call that was made by Ms.

DiBenedetto to [the petitioner] was—had originated and terminated, which started and ended, at hitting a cell site on West Spring Street, which is about two blocks away from the Glade Street location. That is the closest cell tower to Glade Street. . . .

"[The Prosecutor]: And what, with regard to that forty-two minute conversation, what were you able to conclude, by reviewing the records?

"[Detective Simone]: We were able to conclude that the call was placed from Ms. DiBenedetto's phone to the phone being held by [the petitioner]. We were able to tell that [the petitioner] was in New Haven at the time the phone call was placed from Robin and the terminating cell site, which is the ending cell site, for that call for the other phone, for [the petitioner's] phone, was also in New Haven.

"[The Prosecutor]: Okay. And at any point in time, did the—during that time period, did [the petitioner's] phone hit off of the West Spring Street tower?

"[Detective Simone]: Yes. At the completion of that forty-two minute phone call there were, I believe, four additional calls, not as long in duration. During those four calls, both phones were in the location of the West Spring Street cell site.

"[The Prosecutor]: And do you recall what time those phone calls were made? . . .

"[Detective Simone]: There was a phone call at 3:52 a.m., at 3:55 a.m., and at 3:57 a.m.

"[The Prosecutor]: And which tower—which cell site did those three calls hit off of?

"[Detective Simone]: The West Spring Street cell tower.

"[The Prosecutor]: And which cell phone was that attributed to?

"[Detective Simone]: To the—both cell phones were on that same—the calls were made from one cell phone to the other, and they were both on that same tower.

"[The Prosecutor]: Okay. Was there anything else that you were able to determine by looking at the cell phone records?

"[Detective Simone]: We were able to determine that based on the 911—first 911 call coming in at 3:57 a.m., following the shooting, the cell records indicate that at 3:58 an additional call was placed, also off the same cell tower, followed up by additional calls, and the calls, at that time, started to go away from the West Haven area and started hitting New Haven towers.

"[The Prosecutor]: Okay. Which you would take to mean what?

"[Detective Simone]: I would take that to mean that

both phones were on Glade Street prior to the shooting and at the end of the shooting; at the completion of the shooting both phones moved away from Glade Street and returned to New Haven."

Attorney Hopkins briefly cross-examined Detective Simone but did not cross-examine him or object to his testimony pertaining to his interpretation of the records' ability to show the petitioner's location on Glade Street. We reiterate that Susan Johnson, the T-Mobile custodian of records, testified on the day after Detective Simone testified at trial. She testified about the cell phone records of DiBenedetto's two cell phones, which were recorded during the early morning hours of September 30, 2007. In essence, Susan Johnson testified that the records indicated that one of DiBenedetto's cell phones made several calls to the other during the time period spanning from 3:10 a.m. to 4:19 a.m. Furthermore, Susan Johnson testified that these calls initially were transmitted through a cell tower in New Haven near the Sports Haven nightclub, were transmitted later through a cell tower in West Haven near Glade Street at a time immediately prior to the time at which the shooting occurred, and finally were transmitted through a cell tower near DiBenedetto's residence in New Haven at a time shortly after the time at which the shooting occurred. Attorney Hopkins only briefly questioned Susan Johnson.

Although Detective Simone incorrectly testified that the cell phone records proved that both of DiBenedetto's cell phones were on Glade Street prior to and after the time of the shooting, we conclude that the habeas court properly determined that the petitioner failed to establish prejudice as a result of Attorney Hopkins' cross-examination of Detective Simone and Susan Johnson. With respect to Detective Simone, the habeas court found that "the petitioner ha[d] not demonstrated that he was prejudiced by Attorney Hopkins' failure to object to [Detective Simone's] testimony . . . because the evidence linking the petitioner to the crime was substantial." With respect to Susan Johnson, the habeas court noted that a trial attorney's manner of questioning a witness is a tactical decision that typically is not second-guessed by a reviewing court. See *Velasco* v. *Commissioner of Correction*, supra, 119 Conn. App. 172.

The habeas court found credible Attorney Hopkins' testimony that he did not challenge the ability of the cell phone evidence to show the movements of the petitioner because there was additional evidence, including eyewitness accounts, placing the petitioner at the scene of the shooting. Furthermore, the habeas court found credible Attorney Hopkins' testimony that he deemed the cell phone evidence to be a "double-edged sword" because although the evidence placed the petitioner near the scene of the shooting, it also

established that he was on the cell phone when the shooting occurred, which, in his opinion, made it less likely that the petitioner committed the shooting.

In addition to the testimony that the habeas court noted in the memorandum of decision, Attorney Hopkins testified at the habeas trial that he did not see how much evidentiary weight the cell phone evidence added to the state's case against the petitioner because it generally corroborated undisputed facts. Furthermore, Attorney Hopkins testified that there was more reliable evidence showing that the calls between DiBenedetto's two cell phones had occurred at about the time of the shooting and that one easily could have concluded that the petitioner was using one of those phones at the time of the shooting based upon such evidence. Finally, Attorney Hopkins testified that he was more concerned about other, more incriminating evidence offered by the state that tended to prove that the petitioner had committed the shooting, namely, eyewitness accounts placing him at the scene of the shooting and his letter from prison wherein he essentially had admitted that he committed the crime.

Based upon our review of the record, we agree with the habeas court's determination that there was other probative evidence linking the petitioner to the shooting. See part I B of this opinion. In light of this and other admitted evidence aside from the cell phone evidence, as well as the testimony pertaining to the cell phone evidence from the petitioner's habeas proceedings, we readily conclude that it is not reasonably probable that any additional or tactically different cross-examination of Detective Simone or Susan Johnson regarding the cell phone evidence would have changed the result of the petitioner's criminal trial.

D

We now address the petitioner's claim that he received ineffective assistance of counsel because of Attorney Hopkins' failure to call his own expert witness who could testify as to a contrary interpretation of the cell phone evidence than that presented by the state. "[T]here is no per se rule that requires a trial attorney to seek out an expert witness." (Internal quotation marks omitted.) *Antonio A.* v. *Commissioner of Correction*, 148 Conn. App. 825, 833, 87 A.3d 600, cert. denied, 312 Conn. 901, 91 A.3d 907 (2014); *Thompson* v. *Commissioner of Correction*, 131 Conn. App. 671, 696, 27 A.3d 86, cert. denied, 303 Conn. 902, 31 A.3d 1177 (2011). "[T]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." (Internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, 134 Conn. App. 44, 57, 37 A.3d 802, cert. denied, 304 Conn. 919, 41 A.3d 306 (2012).

At the habeas trial, the petitioner presented a radio-frequency engineer, Darrow, as a witness with expertise in cell phone data. In essence, Darrow testified that based upon his review of the cell phone evidence and the trial record, the cell site data relied upon by the state could not pinpoint that the cell phone that the petitioner was using was on a particular street at the time surrounding the shooting. Darrow, however, did testify that the cell site data showed that the phone that the petitioner was using was within 1.7 miles of the cell tower nearest to Glade Street. Thus, the petitioner's own witness interpreted the cell phone evidence in a manner consistent with what Susan Johnson indicated the cell phone records revealed at trial. Even if Attorney Hopkins had called an expert witness during the petitioner's criminal trial, the jury would have heard that although the cell phone records did not pinpoint the petitioner's exact location, they nevertheless showed that he was using a cell phone in an area that included the scene of the crime when it occurred. Accordingly, we agree with the habeas court that the thrust of Darrow's testimony shows that if Attorney Hopkins had called an expert witness to testify about the cell phone evidence at the petitioner's criminal trial, there is not a reasonable probability that the outcome of the petitioner's criminal trial would have been different. Furthermore, the overwhelming evidence of the petitioner's guilt aside from the cell phone evidence would not have been affected by expert testimony. We conclude that the habeas court did not err in its determination that the petitioner failed to establish prejudice as a result of Attorney Hopkins' decision not to call an expert witness regarding the cell phone evidence.

II

Finally, we address the petitioner's claim that the habeas court erred by not concluding that he received ineffective assistance of counsel because of Attorney Hopkins' failure to call as a trial witness Kidd, a taxi driver who had been present at the scene of the shooting and who subsequently gave a statement to the police. The petitioner claims that he received ineffective assistance because Attorney Hopkins' decision not to call Kidd as a witness was not a reasonable strategy, especially in light of the fact that Kidd was a disinterested witness who gave a statement to the police that contradicted other evidence linking the petitioner to the shooting.

At the habeas trial, the petitioner presented Kidd's statement to the police as an exhibit and Kidd testified himself. The substance of Kidd's statement to the police was that at about the time of the shooting, he went to pick up a fare at 31 Glade Street and that when he stopped to wait, he heard five or six gunshots and then immediately saw people fleeing. Contrary to the testimony of any of the other witnesses, Kidd stated that

he then heard four or five additional gunshots from a gun wielded by a black man as he "was running down the side of the building after the people that ran." Kidd stated that the man that he allegedly saw had braided hair, was not wearing a hat, and was wearing a black sweatsuit and a black jacket with white panels on the sides. Kidd also stated that he thought the second succession of gunshots sounded like they emanated from a gun of a different caliber than that of the first gun.

During his own testimony at the habeas trial, Kidd testified that immediately before the shooting occurred, a man pulled up in a car, exited, and started shooting into a crowd in the Glade Street parking lot. Kidd further testified that he ducked down and that the whole shooting was over in less than one minute. Kidd also testified that he remembered hearing "two distinct shots," that he did not recall seeing more than one shooter, and that he could only see the shooter's back.

Attorney Hopkins testified during the habeas trial that he chose not to call Kidd as a defense witness primarily because he thought Kidd's statement to the police was unreliable. Attorney Hopkins testified that he believed Kidd to be an unreliable witness particularly because his version of events did not comport with those of the other eyewitnesses. Specifically, Hopkins noted that Kidd was the only eyewitness who believed that there may have been two shooters, or at least that two different guns were used, and who described the shooter as having dreadlocks or braided hair. Furthermore, Hopkins testified that he "just thought what [Kidd] was able to add to the entire scenario was a nullity, essentially."

Although the petitioner alleges that Kidd was the only disinterested witness to the shooting—and thus would have been particularly persuasive to the jury—the record reveals that Henderson, an innocent bystander, also testified to witnessing the shooting. At the petitioner's criminal trial, Henderson testified that he only knew the victim because he was living in the same neighborhood in which he was living at the time of the shooting. Henderson further testified that he was in the Glade Street parking lot when the shooting occurred and that he observed a man wearing a dark-colored hooded sweatshirt and hat emerge from a gray Ford Taurus and commit the shooting.

"[T]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." (Internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, supra, 134 Conn. App. 57. Our review of Kidd's testimony at the habeas trial and his statement to the police leads us to agree with the habeas court's conclusion that Attorney Hopkins did not render ineffective assistance by failing to call

him as a witness at trial. In the memorandum of decision denying the petitioner's petition, the habeas court found that "the petitioner [had] not overcome the strong presumption that Attorney Hopkins' decision to not call Kidd as a witness constituted reasonable trial strategy." In this regard, the court credited as true Attorney Hopkins' testimony that he did not find Kidd reliable and afforded deference to his strategic decision.

We conclude that the petitioner is unable to show that these findings are clearly erroneous. We also agree with the habeas court's conclusion that the petitioner failed to prove prejudice under *Strickland* as a result of Attorney Hopkins' failure to call Kidd as a witness. During the habeas trial, Kidd testified in a manner that was not at all inconsistent with the testimony of the other eyewitnesses. Specifically, he testified that he did not "recall seeing more than one shooter." Although Kidd indicated in his statement to the police that he could not say whether there was only one shooter, his testimony at the habeas trial sheds light on the weakness of his testimony in the petitioner's defense. Even if Kidd had testified that he witnessed more than one shooter, such testimony would still not have exonerated the petitioner. In light of the questionable reliability of Kidd's testimony and his statement to the police, as well as the aforementioned abundance of other evidence linking the petitioner to the shooting, we readily conclude that the habeas court did not commit error in denying the petitioner's habeas petition based upon its conclusion that he did not receive ineffective assistance of counsel.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] For the remainder of this opinion, we shall refer to this evidence as the "cell phone evidence." Specifically, this evidence consisted of cell phone records and accompanying testimonial evidence that the state offered to place the petitioner at or near the scene of the crime.

[2] Susan Johnson was a representative of the cell phone service provider, T-Mobile. She was subpoenaed to present the cell phone records that were admitted as evidence. She also testified about those records at the petitioner's criminal trial.

[3] At the conclusion of the petitioner's habeas proceedings, the petitioner withdrew this sixth ground, and it was not addressed by the habeas court in its memorandum of decision.

[4] The petitioner also claims on appeal that there is a reasonable probability that the jury would have acquitted him if it had heard evidence about the limitations of the cell phone evidence. Although the petitioner labels this claim as separate from his other claims that Attorney Hopkins rendered ineffective assistance in his treatment of the cell phone evidence, we deem the claim as being integral to our consideration of these other claims because it addresses the issue of prejudice, if any, resulting from Attorney Hopkins' treatment of the cell phone evidence.

[5] Other testimony established that the gray Ford Taurus that the shooter was suspected of driving as he fled the scene was headed to this general area of New Haven.

[6] We note that numerous courts across the country have concluded that such evidence is sufficiently well established that a -hearing concerning its scientific reliability is unnecessary, provided that it is relevant to the case at hand. See, e.g., *United States* v. *Jones*, 918 F. Supp. 2d 1, 7 (D.D.C. 2013) (concluding that *Daubert* hearing was unnecessary for cell phone records admitted to locate phone at time calls were placed and noting that the "use

of cell phone records to locate a phone has been widely accepted in both federal and state courts across the country"); see also *Jackson* v. *Allstate Ins. Co.*, 785 F.3d 1193, 1204 n.5 (8th Cir. 2015) (rejecting argument that cell site analysis data is inherently unreliable as evidence); *United States* v. *Schaffer*, 439 Fed. Appx. 344, 347 (5th Cir. 2011) (concluding that expert's testimony on historical cell site location data was neither "untested nor unestablished" and holding that trial court did not abuse discretion in permitting FBI agent to testify as expert in field); *Stevenson* v. *State*, 222 Md. App. 118, 133, 112 A.3d 959 (2015) (concluding that cell phone location evidence was not novel scientific evidence requiring hearing similar to *Porter* hearing under Maryland law); *Wilder* v. *State*, 191 Md. App. 319, 367, 991 A.2d 172 ("[w]e recognize that cellular telephone technology has become generally understood"), cert. denied, 415 Md. 43, 997 A.2d 792 (2010); *State* v. *White*, 37 N.E.3d 1271, 1280–81 (Ohio App. 2015) (holding that cell site analysis from FBI special agent was reliable evidence).

[7] In addition to the incriminating evidence noted in the memorandum of decision, the habeas court adopted the facts as set forth by this court in the petitioner's direct appeal, which also included incriminating evidence against the petitioner. Specifically, these recited facts included Officer Gonce's testimony that he saw a gray Ford Taurus with New York license plates fleeing Glade Street at a high rate of speed immediately after the shooting. *State* v. *Arthur*, supra, 128 Conn. App. 374. Further, these facts included Detective Simone's testimony that when he searched a gray Ford Taurus with New York license plates, which was found in DiBenedetto's driveway on September 30, 2007, he found and seized photographs of the petitioner with friends at a nightclub resembling Sports Haven, in which the petitioner was wearing clothing resembling the clothing worn by the shooter. These photographs also appeared to have been taken the night before. Id., 375–76. Detective Simone also testified that when he interviewed the petitioner, he confirmed that he had been at the Sports Haven nightclub on the night of September 29, 2007. Id., 376. Detective Simone further testified that during this same interview, the petitioner stated that he did not drive, despite the fact that DiBenedetto's neighbor, Brenda Ollison, later testified at the petitioner's criminal trial that she had witnessed the petitioner driving a gray Ford Taurus from DiBenedetto's residence on the weekend of the shooting. Id. Finally, the facts that the habeas court adopted included testimony from DiBenedetto's sister, Lori Ann Johnson, that when she went to DiBenedetto's residence on October 1, 2007, she observed the petitioner's recently washed clothes on a chair, which resembled the clothes that the petitioner had been wearing at the Sports Haven nightclub in the photograph found in the gray Ford Taurus and which resembled the clothing that eyewitnesses observed the shooter to be wearing. Id.

[8] Although the petitioner, in his amended petition, did not specifically claim that Attorney Hopkins rendered ineffective assistance with respect to his *cross-examination*, or lack thereof, of Detective Simone, we interpret the habeas court's decision to have addressed the substance of this issue in its discussion of the petitioner's claim pertaining to Hopkins' *failure to object to* Detective Simone's testimony.

[9] On the next day of trial, Susan Johnson testified that cell site information indicates which particular cell tower a cell phone's incoming and outgoing calls are transmitted through at a given point in time.

---